IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TURNER INDUSTRIES GROUP, LLC,  §
                               §
              Plaintiff,       §
                               §
VS.                            §      CIVIL ACTION H-13-0456
                               §
INTERNATIONAL UNION OF OPERATING§
ENGINEERS, LOCAL 450,          §
                               §
              Defendant.       §

## OPINION AND ORDER

Pending before the Court in the above referenced action, seeking damages and a declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that it has an enforceable labor contract[1] with Defendant International Union of Operating Engineers (IUOE"), Local 450 ("Local 450") and that Local 450 is in ongoing, material breach of that agreement, grounded in Section 301(a) of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 185(a),[2] and tortious interference with

---

[1] A copy of the contract (Master Crane Rental Evergreen Project Labor Agreement, dated July 1, 2012) is attached to TIG's Complaint, Ex. A #1 (but actually filed separately in #3) and to TIG's Amended Complaint, Ex. A to #11.

[2] Section 185(a) recites,

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in a district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

-1-

prospective business relations under Texas common law, is Local 450's motion for summary judgment (instrument #56).

After reviewing the record and the applicable law, for the reasons indicated below the Court concludes that the motion for summary judgment should be denied.

### Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which movant bears the burden of proof at trial; a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v.*

*Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990),

quoting *Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991). The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. General*

*Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

### Allegations of the Second Amended Complaint

Plaintiff Turner Industries Group, LLC ("TIG") is a Louisiana Limited Liability Company licensed to do business in Texas.  At all relevant times it is involved in industrial construction and maintenance work at job sites in and near Houston, Texas.  TIG asserts that Local 450, a labor organization within the meaning of the LMRA, and TIG are parties to the contract in dispute, which covers wages, hours, and working conditions for certain represented employees working on jobs in Texas for TIG.  Up until TIG initiated this suit, under the contract Local 450 was notified by TIG through 450's Louisiana sister union, IUOE Local 406 ("Local 406"), about each TIG job in Local 450's area, and TIG paid working dues and apprenticeship fund contributions, which were accepted, for those TIG employees who are traveling members of Local 406.  Since they entered into the contract, TIG has requested that Local 450 refer employees for TIG's jobs, but Local 450 either refused or was unable to refer enough qualified operators in a timely manner to

meet TIG's needs, so TIG relied on traveling members of IUOE Local 406 to provide them.

Before January 28, 2013, Local 450 filed a grievance under the July 1, 2012 contract in which it specifically stated that the contract was enforceable. Then in a letter dated January 28, 2013 (Ex. 2) Local 450's attorneys claimed that the contract had not been "consummated," but that even if it had been consummated, TIG had breached it by failing to inform Local 450 of jobs in the Houston area and/or by failing to staff those jobs with Local 450 members. The letter then declared the contract was terminated as of that date.

Around February 11, 2013, Local 450 started refusing to clear traveling members of IUOE Local 406 to work for TIG in the Houston area serviced by Local 450, even though the contract required such clearance. It also began, through its agents and representatives, to threaten and coerce Local 406 members and non-Local 406 members with charges, trials, and fines to be assessed against them if they continued to work for TIG. TIG immediately asked IUOE General President James Callahan to intervene in and resolve the dispute, but he did not respond to the request.

On or before February 18, 2013, agents of Local 450 threatened TIG employees, all members of IUOE Local 406, some of whom were working in Louisiana, that if they continued to work for TIG in the Houston area without Local 450 clearance, the IUOE would impose

-6-

disciplinary fines of thousands of dollars on each of them and that those fines, unless sooner paid, would be deducted from retirement benefits due to them from the Central Pension Fund of the International Union of Operating Engineers and Participating Employers (the "Fund").  The Fund is an ERISA-regulated, multi-employer retirement plan, and Agents of the International Union of Operating Engineers are ERISA plan fiduciaries.  If the threats were carried out, these responsible Fund fiduciaries would be exposed to civil and criminal penalties.

TIG claims that because of the clearance refusals, threats of charges, trials, and fines and the threatened retirement benefit deductions, a number of employees have stopped working for TIG in both the area serviced by Local 450 and that serviced by Local 406. It further asserts that after employees quit, the disruption in TIG's work caused it significant financial loss, all intended by Local 450.

The Amended Complaint alleges causes of action for (1) breach of contract, for which it seeks a speedy hearing and a declaratory judgment that the contract has been in effect and remains in effect and that Local 450 materially breached it by failing to clear in members of Local 406 to work on certain projects TIG had in Texas[3];

_____

[3] Local 450 claims that it lawfully repudiated the contract on January 28, 2012.  In the Amended Complaint TIG argues that if the contract was legally repudiated, Local 450 lacked any contractual justification for its unlawful threats and tortious interference with TIG's actual and prospective relationships with those Local 406 members on whom TIG relied to provide

alternatively, if Local 450's claimed repudiation of the contract on January 28, 2013 was effective, TIG asserts a cause of action for (2) deliberate tortious interference with prospective business relationships with both Local 406 members and non-406 members.

### Local 450's Motion for Summary Judgment (#56)

Local 450 asserts the following facts with supporting documentary evidence.

The IUOE, which represents the crane operators and oilers in dispute in this action, and its local unions are regulated by the Constitution of the International Union of Operating Engineers, which provides that a local union has jurisdiction over a geographical area as indicated in the charter issued to that local union by the IUOE. #56, Ex. B at 34-45. Local 450 has jurisdiction over 101 Texas counties (Ex. L, Dep. of Fred Swift, Local 450's Business Agent, at 7:14-16), while Local 406 has jurisdiction over the whole of Louisiana. The Constitution states, "Members of one Local Union shall not seek employment, be employed, or remain at work at the craft within the territorial jurisdiction of another Local Union without the consent of such other Union." Ex. B at 47. Moreover traveling members must obtain "clearance" to

---

crane operator services within the Houston area. TIG contends that the Local 450's threats amount to independently tortious or unlawful acts and that the threats were made with a conscious desire to prevent TIG's relationships with Local 406 from happening. Local 450 allegedly made threats to non-406 members, too, with a conscious desire to prevent TIG from maintaining or forming prospective business relationships with them.

work in another local union's geographical territory by presenting a "clearance card" or by paying "travel service dues," with one exception not applicable here.  Ex. B at 47-48.  Local unions do not have discretion to refuse to "clear in" a limited number of a contractor's "key employees" if four conditions[4] are met (but it is undisputed that the four were never satisfied here).  Ex. B at 48.

Local 450 charges that Plaintiff and certain members of Local 406 have been violating the Constitution since the 1980's by having Local 406 members work for TIG within Local 450's jurisdiction without obtaining clearance from Local 450.  Dep. of James Michael Morain, Executive Vice President for TIG's Equipment Division, Ex. K at 11:12-15:14; Dep. of TIG's Davis J. Lauve, Ex. I at 8:20-10:8.  Angry Local 450 members  picketed the job sites where the Local 406 members were working for TIG and threatened the Local 406 members with disciplinary charges.  On a few projects TIG entered into single-project agreements with Local 450, but after they were

---

[4] The four conditions are "1) the employer signs or is a signatory to the Local Unions master agreement for the area in which the job in question is located; 2) the employer has a pre-job conference to identify the key employees and address any other issues before each job on which key employees are used; 3) the employer agrees, upon presentation of appropriate authorization, to collect from key employees the local working dues and/or administrative dues and remit such to the Local Union in whose jurisdiction the work is being performed; and 4) the employer agrees that the wage rate paid key employees will be at least the rate paid under the agreement of the Local Union in whose jurisdiction the work is performed, and the fringe benefit rate paid will be the higher of the rates of the key employee's home Local or the Local where the work is being performed."  Ex. B at 48.

TIG points out that this same provision later states that the Local Union has authority to "mutually agree to a different key employee arrangement" than the one described earlier that discusses the four conditions.  #60, Ex. 13 at p. 49.

completed TIG returned to its practice of using Local 406 members without clearance.  Ex. I at 8:20-11:15.

In the years before 2010, TIG, represented by Davis Lauve, *inter alia*, and Local 450 business manager Ronnie Witt (Ex. I at 12:2-13:8), had a verbal agreement to use Local 406 members without clearance in Texas in exchange for TIG's remitting dues and apprenticeship contributions to Local 450.  From this remittance apparently, Witt embezzled hundreds of thousands of dollars from Local 450 and the health and welfare benefit plan for its members; ultimately Witt was sentenced to federal prison and required to pay nearly $200,000 in restitution in cause number 4:11-cr-0479 (Ex. E, Judgment in *U.S.A. v. Ronald Witt*).[5]

Around the spring of 2009 Witt was removed as Local 450's Business Manager and Local 450 was put under IUOE's supervision.  Ex. A at 2, Decl. of Mark Maher, who was hired by Michael Wall and became Business Manager of Local 450; Ex. J, Maher's Dep. at 15:5-15, 29:16-31:2; Ex. B at 22-24.  Mike Wall, who was unaware of the arrangement between TIG and Witt, became the main supervisor of Local 450.  Maher Dep., Ex. J at 29:16-23.  Wall questioned whether TIG could work Local 406 members in Texas without a labor

---

[5] TIG objects to any implication that it conspired with Witt to illegally funnel apprenticeship funds and union dues to Witt before 2010.  It notes that Local 450 cites no evidence that TIG ever had notice that Witt failed to remit such dues to Local 450. Moreover as Local 450's Business Manager Witt had, at minimum, apparent authority to accept such contributions on Local 450's behalf.

agreement.  Lauve Dep., Ex. I at 13:9-20.  As a result, TIG and Local 450 executed another single-project labor agreement in 2010. Lauve Dep., Ex. I at 13:9-14:3.  That project was accomplished by using crane operators and oilers form Local 450 and Local 406. Morain Dep., Ex. K at 18:10-12, 18:24-19:1.  In 2011 TIG and Local 450 executed another single-project labor agreement, and again Local 450 and Local 406 members worked together on that project. Morain Dep., Ex. K at 19:13-15.

In 2012 Lauve, acting for TIG, and Maher, acting for Local 450, began negotiating a labor agreement that would cover more than one project.  Lauve Dep., Ex. I, 15:13-17.  TIG was represented by counsel, while Local 450 was not.  Ex. A at ¶3; Ex. J at 43:16-25. Lauve told Maher that the agreement would not govern all TIG's work in Texas because TIG wanted the flexibility of being able to continue with non-union operations there.  Ex. J at 44:7-21; Ex. I at 21:6-9.  To allow for that flexibility, the contract gave TIG complete control over when the contract would be used by providing a trigger procedure:  "This agreement is binding on the Employer and the Union only on those projects identified to the Union by [TIG] email to Local 450 Business Manager."  TIG Document Production, Ex. O at 23; Ex. I at 20:25-21:18.  Lauve and TIG's counsel drafted the entire agreement, which the parties executed in July 2012.  Maher Dep., Ex. J 43:16-44:21; Lauve Dep., Ex. I at 16:23-25.  Local 450 did not reject any of TIG's proposals for the

contract's terms.  Ex. A at ¶3; Ex. J at 43:16-44; Ex. I at 18:4-6.
TIG concedes that it drafted the language regarding the trigger
procedure, that the trigger was important, that the language was to
protect TIG's ability to have non-union yards and do nonunion jobs
in Texas as well as to protect Local 450, and that TIG intended
that the parties would strictly comply with it.  Lauve Dep., Ex. I
at 18:15-19:1; 20:25-21:5; 21:15-22:2; 23:15-24:1.[6]

     Local 450 asserts that it is uncontested that the trigger
procedure was never employed.  Ex. A at ¶ 4; Ex. M, Plaintiff's
Responses to Defendant's Interrogatories and Document requests, at
14 [Response to Request 17].[7]  Local 450 argues that this non-use
means the contract was never implemented.  Contrary to the plain
language, asserts Local 450, TIG claims that it effected the
triggering notifications by emailing Local 406 (a different
entity), which TIG believes contacted Local 450, though TIG never

---

[6] TIG objects to Local 450's claim that Lauve relied on counsel to draft the July 2012 Agreement, which Lauve disputes.  Ex. 2 at p. 17.  Lauve also objects to Local 450's contention that Local 450 did not reject a single proposal for that agreement  as misleading because Lauve used the standard Local 450 PLA template in creating it.  Lauve did not state that the notice of clearance provision had to "be strictly complied with"; he said it was only necessary that Local 450 receive actual notice, not that the notice be from TIG rather than Local 406.  Ex. 2 at pp. 24-25.

[7] When asked if he understood that no written notifications were ever made to Local 450's business manager about this contract being invoked, Lauve answered "No" and responded "They were made by Local 406," as he was told by Local 406's business manager, Carlos Benoit.  Ex. I, 23:2-24:23.  When asked who made the decision to do the notifications this way rather than by TIG's sending an email to Maher, Lauve answered, "Again it was just a continuation of how we had always done business."  *Id.* 24:24-2.  Lauve conceded that he never proposed language in the contract that it could be invoked by Local 406 notifying Local 450.  *Id.*, 23:4-9.

checked to be sure it did.  Morain Dep., Ex. K at 34:5-35:18; Ex. I at 24:2-23. Conceding that Local 450 never agreed to change the contract's trigger procedure, TIG justifies its contention that it triggered the contract while ignoring the contract's trigger procedure solely on the grounds that contacting only Local 406 "was a standard practice that we had performed under the exact same agreements, previous agreements, and the way we had worked for the previous years."  Ex. K at 34:11-18, 39:1-15.

Local 406 emphasizes that the prior agreements were not the same as this July 2012 agreement.  The previous agreements were restricted to a single, particular project, there was no need to identify the projects that the contract would apply to, and there was never a triggering procedure in any of these earlier contracts.[8]  Ex. C, Master Crane Rental Project Labor Agreements between Plaintiff and Defendant.  Local 406 also asserts that TIG wrote the July 2012 contract in its entirety and could have written it so that it was implemented through Local 406, but never proposed doing so.  Lauve Dep., Ex. I at 25:4-7.  Lauve commented, "The actual means of notification, we said we would do it.  In fact, 406 did it; we did not do it.".  Ex. I a 25:17-18.

In addition the contract stated regarding jobs that it was triggered on, "[A]ll hiring of applicants shall be subject to and

---

[8] Local 406 argues that Morain erroneously testified that those contracts contained triggering provisions identical to the one in the July 2012 contract.  Ex. K at 36:15-37:8.

in accordance with the Union's established Referral Procedure and any amendments thereto." Ex. O at 25. Local 450's Referral procedure mandates that the employer contact Local 450 for referrals, which are to be made from Local 450's out-of-work lists. Ex, D, IUOE Local Union 450 General Referral Procedures. The contract also stated, "Should the Union fail to refer an applicant after two (2) working days, excluding Saturdays, Sundays, and Holidays, the Employer may hire an applicant from any source, provided that the applicant shall first acquire a referral from the Union prior to beginning work." Ex. O at 25-26. In sum, hiring was supposed to be done through Local 450, and only if it failed to provide employees could Plaintiff hire from other sources, such as Local 406 members, who would have to receive clearance from Local 450 to work. It is undisputed that no part of this hiring article was complied with for any project that TIG now claims the contract covered. TIG never went to Local 450 as its initial source of employees. TIG made only one call to Local 450 for a few employees during the entire life of the contract. Ex. K at 31:6-33:18. Instead it always used Local 406 members to staff the jobs that it claims fell under the contract, and it did nothing to ensure that those Local 406 members received clearance from Local 450 to work in Local 450's jurisdiction. Ex. K at 45:5-19.

Arguing that its hiring complied with the contract, TIG contends that a sentence at the end of the contract means that the

contract did not regulate TIG's hiring of Local 406 members and did not apply to them at all:  "Notwithstanding the above, this is a participation agreement only and applies exclusively to employees referred by Local 450." Ex. O at TIG000034; *see also* Morain Dep., Ex. K at 42-43 ("I understand that this agreement as such refers to when we hire Local 450 operators [as opposed to members of Local 406].").  Disagreeing that this sentence excludes Local 406 members from coverage under the agreement, Local 450 points out that the agreement required that every employee on the jobs to which the agreement applied had to be referred by Local 450.   TIG never suggested that the contract simply state that "this agreement doesn't apply to members of Local 406." Ex. I at 35:16-18.  Nor did TIG make revisions to many articles of the contract to be consistent with excluding Local 406 members.[9]  Ex. I at 39:10-40:1.

Other provisions of the contract were also not followed.  For large jobs, the agreement stated, "the Employer agrees to notify the union of such projects and shall arrange a date, time, and place to hold a pre-job conference prior to the commencement of any work." Ex. O at 25.  There is no dispute that TIG never did so.  Ex. I at 26:1-4.  The drafter of the contract, Lauve, testified that this

_____

[9] As an example Local 450 cites Article XXII, Section 1 of Ex. O:  "The Employer agrees that if an employee is assigned to perform work in any classification listed in this Agreement, that  employee shall be an Operating Engineer covered by the terms and conditions of this Agreement."  Although TIG concedes that Local 406 member were employees that were assigned to perform work in classifications listed in the agreement, it simultaneously maintains that Local 406 members were not covered by the agreement.  Ex. K at 49:23-51:4.

-15-

provision required Local 450 to initiate a pre-job conference.  Ex. I at 26:22-27:4.  Morain testified that TIG did not hold pre-job conferences with Local 450 because it never had in the past.  Ex. K at 40:5-13.  Those earlier agreements only involved a single job, observes Local 450.

Furthermore, it is undisputed that not one of the employees on any of the jobs that TIG contends the contract applied to received the wages and benefits set out in the contract, which had no exceptions for Local 406 members even though TIG argues that no contract governed the terms and conditions of employment for Local 406 members when they worked in Texas, including wages.  Ex. K at 45:20-25; Ex. O at 28; Ex. I at 29:13-30:1.

Local 450 summarizes (#56 at 10-11) its contention that

[i]n essence, Plaintiff's position is that the July 2012 agreement with Local 450 constituted a return to the way things worked under Plaintiff's arrangement with the convicted embezzler Ronnie Witt, where Plaintiff could exclusively work Local 406 members in Texas and pay them less than Local 450 wages, as long as it sent checks for dues and apprenticeship fund contributions to Local 450. (Ex. I at 20:13-20, 24:24-25:13, 25:10-16, 27:5-17, 30:2-5, 36:2-18, 38:22-39:6.  This is the case despite the fact that the plain language of the agreement is inconsistent with Plaintiff's arrangement with Witt.

Plaintiff's position also ignores the constraints placed on Local 450 by its bylaws and by the Constitution of the International Union.  Local 450 is unable to "clear in" a member of a sister IUOE local union without a collective bargaining agreement in place to govern the terms and conditions of employment for that member's work in Texas.  (Ex. L at 121:25-122:13, 189:2-11.) Accordingly, what Plaintiff wanted to happen--Local 450 giving clearance to Local 406 members to work in Texas without any contract governing their employment in exchange for a check from Plaintiff--could only happen if

Local 450 employees ignored the IUOE Constitution and Local 450 bylaws, like convicted criminal Ronnie Witt did. The current administration of Local 450 strictly complies with the Constitution and bylaws. (Ex. A at ¶2; Ex. J at 15:21-16:5, 93:14-19, 103:8-18.)

Local 450 claims that this suit arose out of the following events. Once the July 2012 agreement was signed, for the next few months Fred Swift, Local 450's Business Agent, provided clearance for some Local 406 members to work for TIG in Texas because Swift erroneously thought that TIG had been emailing Local 450's Business Manager to fulfill the contract and that TIG had been holding pre-job conferences with that Business Manager. Swift Dep., Ex. L at 40:12-41:15. A number of Local 406 members who had received clearance complained to Swift that the pay they were getting from TIG was lower than that represented in the contracts. Ex. L at 45:18-25, 109:4-8. Around October 2012, Local 450, through Swift, filed a grievance against TIG for violating the agreement by underpaying the Local 406 members. Ex. L at 107:15-109:22, 110:6-19. TIG then contacted Mark Maher, Business Manager of Local 450, who informed Swift that TIG had not been emailing him to commence the agreement. Ex. L, 110:20-111:24. Swift had not told Maher previously that Swift had been clearing the Local 406 members to work for TIG. Ex. A at ¶5; Ex. L at 111:5-14.

In an effort to resolve the wages grievance and address issues arising from the July 2012 agreement, the parties met at the Houston offices of a mediator with the Federal Mediation and Conciliation

Service.  Ex. L at 112:6-19.  When TIG, represented by Dave Lauve, stated that it did not think the agreement applied to Local 406 members, Swift responded that if it did not apply, "there was no way for [Local 450] to clear them in, because there was no agreement to clear them in to."  Ex. L at 116:6-13.  Lauve stated that he needed to confer with people at TIG's headquarters in Baton Rouge and that he would get back in touch with Local 450 in a few days, but neither Lauve not any other person with TIG did so.  Ex. A t ¶6; Ex. J at 50:10-51:10.  Local 450 contends that TIG simply continued ignoring provisions of the agreement, including the trigger procedure, pre-job conference,[10] and hiring and wage provisions and continued to use Local 406 workers in Texas without clearance.  Ex. A at ¶7.  Thus on January 28, 2013 Local 450 informed TIG that it was terminating the July 2012 agreement.  *Id.*; Ex. O at 42-43.  In its termination notice signed by Douglas M. Selwyn, Local 450 stated that the agreement had "never been consummated" because "no construction project had ever been identified by Turner," or, alternatively, "Turner had failed to comply with the negotiated intent, terms and conditions of the agreement" by violating its

---

[10] TIG responds that the language relating to the pre-job conference requirement, found in Article VI, Ex. 9 at p.2, is identical to that in the 2010 and 2011 PLAs.  Article VI of Exs. 6 and 7.  It further asserts that neither TIG nor Local 450 ever held pre-job conferences under either of these PLAs,  Ex. 1 at pp. 40; Ex. 2 at pp. 26-27.  TIG therefore reasonably interpreted the requirement to be relevant only if Local 450 requested one.  Ex. 1 at p. 40; Ex. 2 at pp. 26-27.  Local 450 never made such a request under either PLA or under the July 2012 Agreement.  TIG insists that Local 450s post-repudiation reliance on this provision is insufficient to justify its unilateral rescission.

trigger procedure and hiring and wage provisions.  Ex. L, 123:3-7;
Termination Notice dated January 28, 2013, Ex. O at 42-43 (#56-5 at
p. 15).

Starting February 2013, Local 450 stopped clearing in Local 406
members to work for TIG in Texas.  Ex. L at 120:25-124:3.  Local 406
contacted IUOE members who it knew or suspected were working for TIG
in Texas "and told them that there was not a valid collective
bargaining agreement in place for the project they were on and that,
as such,[11] they were working nonunion and that they could not be
cleared in and that they needed to leave the job or charges would
be brought against them."  Ex. L at 127:1-12.  Also in February
2013, TIG's Executive Vice President Mike Morain held meetings with
Local 406 members employed by TIG and told them Local 450 would no
longer clear them in to work in Texas.  Ex. F, Deposition of Brian
Carpenter, at 10:9-15.  Morain stated that the Local 406 members
"had a life-changing decision to make" in deciding whether to
continue working in Texas, that TIG "was going to man this job [in
Texas] regardless if [Local 406 members] went over there or not;
that he had 12 non-union operators ready to take the job if [Local
406 members] didn't go to do it."  Carpenter Dep., Ex. F at 11:14-
21.  Morain also told the Local 406 members that since they were no
longer being cleared in, if charges were filed on them by Local 450

_____

[11] TIG objects that the IUOE Constitution does not require that a collective bargaining
agreement be in place before clearing any other Local's members.  Ex. 13 at pp. 47-49 (consent
to travel is to be granted if traveling member pays his service dues) and Ex. 5.

-19-

for continuing to work for TIG in Texas, Morain would immediately put them on TIG's benefits package, including health insurance and retirement.  He also stated that any fines imposed on them based on the charges filed against them could be taken out of their pension. Ex. H, Dep. of Johnny Johnson, at 49:7-12.[12]

Some TIG employees quit because of contacts with Local 450, others quit because of what Morain told them, and many continued to work for TIG.  Ex. M at 3-4 [Answer to Interrogatory 6]; Ex. K at 68:17-70:18, 72:3-8.  Regardless, claiming it was damaged by the resignations of a few crane operators threatened with union discipline, TIG chose to no longer employ Local 406 members in Texas and discontinued its long practice of using IUOE members without clearance.  Ex. K at 61:4-16; 65:22-66:8; 72:13-22.

Local 450 moves for summary judgment on TIG's breach of contract claim on the grounds that the contract was never implemented under the plain language of the trigger procedure requiring email notification to Local 450's Business Manager, drafted by TIG, and thus could not have been breached.  That trigger provision was important to TIG because it wanted to continue non-union work in Texas free from any claim by Local 450 that such work should have been done under the contract (Lauve Dep., Ex. I at 21:4-21), and TIG told Local 450 during negotiations that the provision

---

[12] This statement is disputed by Morain and numerous employees present at the meeting. Ex. 1 at p. 66; declarations of Andy Madden, James Carter, Brian Fontenot, Bobby Holt, Jesse Smitherman, Pete Johnson, Mike Higgins, Jimmy Milling, and Tracy Johnson, Ex. 14-22.

was necessary for TIG to agree to the contract (Ex. Maher, Dep., J at 44:7-21).

TIG's sole argument that the agreement was implemented is that it was its standard practice to send emails with the names and job sites of employees to Local 406 without ever verifying that this information was forwarded to Local 450's Business Manager, and that this method was adequate because the parties had been doing it this way, without deviation, for many years through two project agreements and even when there was no project agreement. Morain Dep., Ex. K at 34:19-35:11, 37:23-38:8, 39:1-15. Local 450 insists that TIG's reason is misguided. When the parties has single-project contracts, the single project was stated in the body of the contract and there was no need for TIG to identify to Local 450 to which project the contract applied. Local 450 further charges that when there was no agreement, TIG was engaging in a crime, and Local 450 was threatening Local 406 members with disciplinary charges--clearly not an indication that Local 450 acquiesced in this approach as satisfactory.

Even if TIG is correct that it was following the past practices of the parties, reliance on past practices "is appropriate to interpret ambiguous contract terms," but they "cannot be relied upon to modify clear and unambiguous provisions." *Anheuser-Busch, Inc. v. Teamsters Local 477*, 280 F.3d 1133, 1139 (7th Cir. 2001)(*quoting Tootsie Roll Indus., Inc. v. Local Union #1*, 832 F.2d 81, 84 (7th

Cir. 1987)), *cert. denied*, 537 U.S. 885 (2002).

In sum, Local 450 maintains that TIG's contention that it implemented the contract on jobs in Texas fails as a matter of law. It is undisputed that TIG did not comply with the plain language of the agreement.   There is no evidence that it followed any past practice of the parties in triggering the application of a labor agreement.   Even if there were, past practice cannot be used to modify unambiguous contract terms.  As stated, a contract that was never implemented cannot be breached.   Thus TIG's contract claim fails as a matter of law.

Even if the agreement had been implemented, Local 450 argues it validly repudiated the contract by letter (#9, Ex. B at 1) before the events giving rise to the suit.   Local 450 notes that as an exception to the general rule in the National Labor Relations Act ("NLRA") that extending recognition to a minority union would constitute an unfair labor practice, an employer engaged primarily in the building and construction industry, like TIG, may enter into a pre-hire agreement with a union like Local 450 that has not established majority status in the appropriate bargaining unit.  29 U.S.C. § 158(f).[13]  Because TIG has not alleged that Local 450 has

---

[13] As explained by the Fifth Circuit, a section 8(f) "pre-hire" agreement under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(f), is unique to the construction industry and an exception to the general rule that it is an unfair labor practice for an employer to enter into a collective-bargaining agreement with a union as the exclusive bargaining representative of all the employees in a proposed bargaining unit where the union does not have majority support:

Section 9(a) of the NLRA requires employers to bargain with unions that have been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a); *see also Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 533 (D.C. Cir. 2003). However, the Act treats construction-industry employers differently with respect to the majority-support requirement. *Id.* Section 8(f) allows a contractor to sign "pre-hire" agreements with a union regardless of the unions's majority status. 29 U.S.C. § 158(f); *Nova Plumbing*, 330 F.3d at 534; *In re Staunton Fuel & Material, Inc.*, 335 NLRB, 717, 718 (2001). The reason for this limited exception lies in the unique nature of the construction industry, which is organized differently because employees frequently work for multiple employers for short periods of time. *See Nova Plumbing*, 330 F.3d at 534; *American Automatic Sprinkler Sys., Inc. v. NLRB*, 163 F.3d 209, 214 (4th Cir. 1998); *NLRB v. Catalytic Indus. Maint. Co.*, 964 F.2d 513, 515 n.1 (5th Cir. 1992).

Sections 8(f) and 9(a) also differ in their treatment of the employer's bargaining obligations after a contract expires. *See Staunton Fuel*, 335 NLRB at 718; *see also Nova Plumbing*, 330 F.3d at 533. A construction-industry employer may refuse to bargain after the expiration of an 8(f) agreement because the union never enjoyed the presumption of majority support. *Id.* at 534; *Am. Automatic Sprinkler*, 163 F.3d at 215. In contrast, a non-construction employer must continue bargaining with a union after a 9(a) agreement expires because the union is entitled to a continuing presumption of majority status. *Nova Plumbing*, 330 F.3d at 534; *Am. Automatic Sprinkler*, 163 F.3d at 214; *Staunton Fuel*, 335 NLRB at 718 . . . . This presumption can be rebutted by the employer with evidence that the union has lost majority support. *See Staunton Fuel*, 335 NLRB at 718 . . . .

*Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518-19 (5th Cir. 2007).

The agreements at issue in this suit are Project Labor Agreements, or PLAs, a type of section 8(f) pre-hire agreement that

is a multi-employer, multi-union agreement designed to systematize labor relations at a construction site. It typically requires that all contractors and subcontractors who will work on a project subscribe to the agreement; that all contractors and subcontractors agree in advance to abide by a maser collective bargaining agreement for all work on the project; and that wages, hours, and other terms of employment be coordinated or standardized pursuant to the PLA across the many different unions and companies working on the project.

*United Brotherhood of Carpenters and Joiners of America, AFL-CIO v. Operative Plasterers' & Cement Masons' Intern. Ass'n of U.S. & Canada, AFL-CIO*, 721 F.3d 678, 693 (D.C. Cir. 2013). "A PLA typically requires employers to recognize the signatory unions as the collective

majority status, the alleged agreement, if valid, was a pre-hire agreement under 29 U.S.C. § 158(f) and therefore "is voidable until such time as the union achieves majority support in the appropriate bargaining unit," i.e., can be repudiated at any time. *NLRB v. Haberman Const. Co.*, 641 F.2d 351, 357 (5th Cir. 1981), *citing NLRB v. Local 103, International Assoc. of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 341 (1978); *Strand Theater of Shreveport Corp. v. NLRB*, 493 F.3d 515, 519 n. 1 (5th Cir. 2007)("Although other circuits have adopted [*John Deklewa & Sons, Inc.*, 282 NLRB 1375 (1987)(holding that such agreements cannot be repudiated during their terms)], the Fifth Circuit has not conclusively adopted or rejected *Deklewa's* holding."). Local 450 points out that the Supreme Court opined in *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 270 (1983), "[A]lthough the voidable nature of prehire agreements clearly gave petitioner the right to repudiate the contract, it is equally clear that petitioner never manifested an intention to void or repudiate the contract." Local 450 maintains that in contrast, it plainly manifested its intent to repudiate the alleged contract if it ever was in effect, and TIG has not claimed that Local 450 took any action inconsistent with

---

bargaining representatives of the employees engaged in work thereunder; to secure labor from union hiring halls; and to agree to the terms of the PLA before working on projects governed by the Pla. A PLA also typically standardizes wages, work rules and hours; provides for the supremacy of the PLA over conflicting provisions of individual collective bargaining agreements; and contains no-strike, union security and dispute resolution provisions. *Id.*

repudiation after that date--indeed, the allegations show Local 450 acted in accordance with its repudiation.  Therefore TIG's request for a declaratory judgment that the contract is in force and that Local 450 is in material breach must be dismissed.

Even if the contract had been implemented and could not be repudiated, Local 450 maintains that its actions in refusing to clear Local 406 members to work for TIG did not breach any of the contract's provisions.  Nothing in the contract required Local 450 to clear in all traveling members of Local 406 that TIG wished to employ in the Houston area serviced by Local 450.  When TIG was asked during discovery to identify the provisions of the agreement that required such clearance, TIG pointed only to a sentence in the preamble:  "Local 450 will in turn work with Turner to promote the utilization of IUOE members within the crane rental industry, and to facilitate the employment of Local 406 members on the projects." Ex, M at 1 [Answer to Interrogatory 2]; Ex. O at 23.  This sentence does not require Local 450 to clear in any and all Local 406 members that TIG wanted to employ in Texas; instead Local 450 was to act as the initial source of employees on jobs to which the contract applied, and Local 406 members could only be hired if Local 450 could not supply satisfactory employees.  Local 450 insists that it is undisputed that this procedure was never employed.  Because TIG did not satisfy the condition that would arguably require Local 450 to clear in Local 406 members, TIG's breach of contract claim fails

-25-

as a matter of law.

TIG's breach of contract claim, even if plausible and the contract valid, still fails because it was brought in an improper forum since the agreement has a mandatory arbitration provision for any dispute involving application or interpretation of the agreement.  Ex. O, Article X, Section 2, Step 3.  It is established law that a presumption of arbitrability can only be overcome if Plaintiff demonstrates that the arbitration clause cannot possibly be interpreted to cover the asserted dispute.  To do so TIG must, but has not, (1) demonstrated that the dispute is expressly excluded from the arbitration obligation or (2) produced "the most forceful evidence" of an intent to exclude the dispute from arbitration. *Communications Workers of America v. Southwestern Bell Tel. Co.*, 415 F.2d 35, 39 (5th Cir. 1969)(*citing United Steelworkers of America v, Warrior and Gulf navigation Co.*, 363 U.S. 574, 585 (1960)); *Paper, Allied-Industrial, Chemical and Energy Workers Intern. Union Local No. 4-2001 v. ExxonMobil Refining & Supply Co.*, 449 F.3d 616, 620 (5th Cir. 2006).  Local 450 notes that TIG's failure to follow the contract's grievance as well as its arbitration procedure supports Local 450's argument that the contract is not a binding agreement that applies to any project.[14]

---

[14] Article X of the contract (#56, Ex. O) sets out in a very broad provision the grievance and arbitration procedure:

Section 1:  Any dispute arising under the application or interpretation of the terms

Furthermore, even if the claim was not subject to mandatory arbitration, Local 450 insists that it is now moot because the

and conditions of this Agreement shall be resolved in accordance with the procedures set forth herein.  No employee shall be discharged without just cause.  No grievance shall be recognized unless called to the attention of the Employer by the Union or to the Union by the Employer within five (5) days, excluding Saturdays, Sundays, and Holidays, after the alleged violation occurred or became known to the aggrieved party.  Any employee, alleging a violation of this Agreement, shall file a grievance within five (5) working days, excluding Saturdays, Sundays, and Holidays, of the occurrence of the event which gave rise to the grievance or from the time the event became known to the affected employee or employees; otherwise the grievance shall be considered waived.

Section 2:  The time limits specified in this Article may be extended by mutual agreement between the parties.

Step 1:  The dispute shall be referred to the Representative of the Union or his designated representative and the Project Superintendent and/or the Employer's Representative at the construction project within five (5) working days, excluding Saturdays, Sundays, and Holidays.  A conference will be held during that time between the Union's Representative and the Employer's Superintendent or Representative to attempt to reach a resolution.

Step 2:  In the event the dispute is not resolved in Step 1 above, the grievance shall be reduced to writing and referred to the union's Business Manager or Business Representative and the Employer's Project Manager or Human Resource Manager within seven (7) working days after the date of the Step 1 conference, excluding Saturdays, Sundays, and Holidays, to attempt to reach a resolution.

Step 3:  In the event the dispute is not resolved in Step 2 above, then either party may refer the matter for final and binding Arbitration within seven (7) working days, excluding Saturdays, Sundays, and Holidays, after the date of the Step 2 conference.  An impartial Arbitrator shall be selected from a panel of Arbitrators submitted by and in accordance with the rules and regulations of the Federal Mediation and Conciliation Service.  Thereafter, the parties shall defer to the decision of the Arbitrator.  It is agreed that the Arbitrator shall have no authority to change, amend, add to, or detract from the provisions of this Agreement, but shall only rule on the applicability of the Agreement to the specific grievance submitted to him.  The expense of the Impartial Arbitrator shall be borne equally by the union and the Employer.  The decision of the Arbitrator shall be final and binding on all parties.

contract expired on June 30, 2012.  The only relief TIG prayed for
is a declaration "that the Contract is in force" and "that Local 450
is in material breach," i.e., corresponding to injunctive relief.
"'It is axiomatic that a request for injunctive relief remains live
only so long as there is some present harm left to enjoin.'"  *De
Mino v. Achenbaum*, Nos. 02-20772, 02-20943, 81 Fed. Appx. 819, 820
(5th Cir. 2003)(*per curiam*), *quoting McClelland v. Gronwaldt*, 155
F.3d 507, 514 (5th Cir. 1998), *overruled on other grounds, Arana v.
Ochsner Health Plan*, 338 F.3d 433, 440 & n.11 (5th Cir. 2001)(*en
banc*).

    Last of all, the elements of a claim for tortious interference
with prospective business relations include "(1) a reasonable
probability that the parties would have entered into a contractual
relationship; (2) an 'independently tortious or unlawful' act by the
defendant that prevented the relationship from occurring; (3) the
defendant did such act with a conscious desire to prevent the
relationship from occurring or he knew that the interference was
certain or substantially certain to occur as a result of his
conduct; and (4) the plaintiff suffered actual harm or damage as a
result of the defendant's interference." *RAJ Partners, Ltd v. Darco
Const. Corp.*, 217 S.W. 3d 638, 649 n.10 (Tex. App.--Amarillo 2006,
no pet.).  Local 450 contends that TIG has no evidence of any
independently tortious or unlawful act by Local 450 and therefore
its tortious interference claim fails as a matter of law.  "[A]

-28-

plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful.  Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W. 3d 711, 726 (Tex. 2001).

TIG makes three arguments that Local 450's conduct was independently tortious or unlawful, none of which is sufficient to support a claim for tortious interference with prospective business relations.  First, TIG claims that the threats to file disciplinary charges violated § 511, 29 U.S.C. § 1141,[15] of ERISA (Ex. M at 5 [Answer to Interrogatory 9], but that the statute by its own terms is only violated when a person uses "fraud, force, violence or threat of the use of force or violence" and Plaintiff has not made such allegations.  TIG also asserts as "independently tortious or unlawful" that Defendant's unlawful threats additionally satisfy the elements of duress under Texas law, i.e., threatening to do something that the party has no legal right to do.  *State Nat. Bank v. Farah Mfg. Co.*, 678 S.W. 2d 661, 684 (Tex. App.--El Paso 1984,

---

[15] Section 1141 provides,

It shall be unlawful for any person though the use of fraud, force, violence or threat of use of force or violence to restrain, coerce, intimidate, or attempt to restrain, coerce, or intimidate any participant or beneficiary for the purpose of interfering with or preventing the exercise of any right to which he is or may become entitled under the plan, this subchapter, section 1201 of this title, or the Welfare Pension Plans Disclosure Act [29 U.S.C. § 301, *et seq.*].  Any person who willfully violates this section shall be fined $100,000 or imprisoned for not more than ten years, or both.

writ dism'd by agreement).  Local 450 responds that it is undisputed
that under the Constitution any member or officer of the IUOE can
file disciplinary charges against any other member, and threatening
to do something that a party has a legal right to do cannot sustain
a claim of duress.  *State Nat. Bank v. Farah Mfg. Co.*, 678 S.W. 2d
661, 684 (Tex. App.--El Paso 1984, writ dism'd by agr.).  Last, TIG
claims that Local 450 defamed TIG in statements made to Heather
Cusenza and Pete Johnson (Ex. N at 2), but Johnson entered into a
business relationship with TIG after his communications with Local
450 and thus Local 450 did not prevent the relationship from
occurring (Ex. M at 3-4 [Answer to Interrogatory 6].

   Furthermore Cusenza's statements of opinion cannot constitute
defamation as a matter of law.  "All assertions of opinion are
protected by the first amendment of the United States Constitution
and article I, section 8 of the Texas Constitution."  *Carr v.
Brasher*, 776 S.W. 2d 567, 570 (Tex. 1989).  "[W]hether a publication
is an actionable statement of fact or a constitutionally protected
expression of opinion" is a question of law and "depends on a
reasonable person's perception of the entirety of a publication and
not merely on individual statements."  *Bentley*, 94 S.W. 3d at 580,
579.   To be actionable as defamation, a statement must be an
assertion of verifiable fact.  *Bentley v. Bunton*, 94 S.W. 3d 561,
583-84 (Tex. 2001).  Moreover the assertion must be false; a showing
of substantial truth of defamatory words will defeat a defamation

claim.  *McIlvain v. Jacobs*, 794 S.W. 2d, 14, 15-16 (Tex. 1990).
Last, TIG asserts that Local 450 defamed  TIG in statements made to
Heather Cusenza and Pete Johnson.  The following statement was
allegedly made by a representative of Local 450 to Cusenza which TIG
claims was defamatory:  "You know, he told us that, you know, it is
not a good company to work for.  And then I know that--he mentioned
something about--about an agreement and them backing out--Turner
backing out, but I don't remember the entire conversation."  Ex. G,
Cusenza Dep. at 26:15-25.  Local 450 asserts that the statement is
not objectively verifiable as fact and cannot be the basis of a
defamation claim.  Even if it was defamatory, there is no evidence
that it prevented Cusenza from entering into a business relationship
with TIG.  Cusenza testified that she resigned her job with TIG
because a business agent with Local 450 told her he would file
charges against her if she did not resign.  Ex. G at 12:12-13:13.
There is no evidence showing that Cusenza resigned because the Local
450 representative told her that TIG was not a good company to work
for or that TIG had backed out of an agreement.

Furthermore, Local 450 argues again, as it did in its motion
to dismiss (#19), that Plaintiff's tortious interference claim is
preempted by federal labor law under *San Diego Bldg. Trades Council
v. Garmon*, 359 U.S. 236 (1959).

Local 450 further maintains that TIG's claim fails because all
of its evidence of damages is speculative or conjectural and damages

therefore cannot be recovered. *Tate v. Goins, Underkofler, Crawford and Langdon*, 24 S.W. 3d 627, 635 (Tex. App.--Dallas 2000, pet. denied)("Damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts.   Remote damages, or those damages that are purely conjectural, speculative, or contingent, are too uncertain to be ascertained and cannot be recovered.").   Michael Morain, the only person identified by TIG as having knowledge of TIG's damages, admitted in his deposition that all of TIG's damages are speculative.   Ex. P, TIG's Second Supplemental Disclosures at 1-3; Ex. K at 107:11-18.

### TIG's Response (#60)

According to TIG the parties initially followed the grievance procedure set out in their agreement, but failed to resolve their dispute at the January 15, 2012 Federal Mediation and Conciliation Service ("FMCS Mediation").   Local 450 Business Manager Mark Maher then authorized his attorney to send TIG the January 28, 2013 letter allegedly unilaterally rescinding the labor contract.   Subsequently Local 450 commenced threatening Local 406 members hired by TIG.   TIG represents that rather than subject Local 406 crane operators to the threatened charges and fines asserted by Local 450, TIG went to the open market and recruited, hired, trained, and supervised replacement operators, thereby incurring thousands of dollars of

damages.  Thus it had to file this suit to recover its losses.

More specifically, TIG claims that it had a collective bargaining relationship with Local 406 for years that governed those 406 members who performed work in Texas for TIG.  Locals 406 and 450 entered into two separate agreements, one in 1995 and the other in 2010, that provided that members of each Local could cross over into Texas and/or Louisiana to perform work for contractors including TIG.  #60, Maher's Dep, Ex. 3, 45-46 and 96-98; Carlos Benoit's Dep., Ex. 4 at 14-15; and Ex. 5, March 28, 2010 Crane Rental Clear-In Procedure.  These Local 450/406 Clear-In Agreements reflected that TIG would remit apprenticeship contributions and union dues to Local 450 for the Local 406 member that Local 450 cleared to work in Texas on jobs for four days or longer.  Under these Clear-In Agreements, when a local traveling member was told by his employer to work outside the jurisdiction of his home local, he was responsible for informing either his home local or the local having jurisdiction of the work about his assignment and its  duration.  Ex. 5, Crane Rental Clear-In Procedure between IUOE Locals 450 and 408, March 18, 2010, which was a renewal of the earlier version of the same agreement.  It was the established custom and practice for Local 406 members performing work in Texas to rely on TIG to contact 406 Business Representative Carlos Benoit, who in turn would immediately relay by telephone to Local 450's representatives the required information to clear the 406 workers in to Local 450's

jurisdiction.  Ex. 4 at 8, 10-12, 15-21, 31, 51, 57-60.  This custom/practice of providing notice was well established when the parties entered into the July 2012 Agreement, and TIG argues it would have been construed as acceptable procedure under the 2012 agreement.

TIG explains that in January 2010 it entered into a Project Labor Agreement ("PLA") with Local 450 for which TIG provided crane operators to Huntsman Chemical in Port Neches.  Ex. 6.  Although the PLA stated it need 450 workers, TIG worked the job mainly with Local 406 operators and used 450 operators only to "fill the gaps," which existed in part because 450 operators had failed drug tests, had deficient skill sets, and were experiencing increasing discord with the 406 operators on the job.  Ex. 1 at pp. 18-20.  In August 2011, TIG again entered in to a PLA (Ex. 7) for work at Exxon's Baytown facility, and again used 450 operators as it had at the Huntsman Chemical site.  *Id.*  Morain testified that Local 450 members constantly "badgered" the 406 members on Texas jobs so that TIG found it had to take some action to protect them.  Therefore it accepted Local 450's request to enter into a broader agreement covering more Texas projects.  Lauve Dep.,Ex. 2, pp. 15, 20, 27; Morain Dep., Ex. 1, pp. 21-23.  Lauve drafted the agreement without counsel's advice, and it was executed by the parties in July 2012.  Ex. 2 at 16-20; Ex. 8 July 2012 Master Crane Rental Evergreen Project Labor Agreement.

The notice procedure in the new July 2012 agreement differed from the practice under the 406/450 March 2010 agreement in providing that TIG should email Local 450 the same information that it had previously emailed to Local 406 when 406 members worked in Texas. Nevertheless, claims TIG, TIG and 450 continued to use the same notification procedure they had used in previous years: TIG would email the required notice to Local 406, which would then send it on to Local 450 by phone. Ex. 2 at pp. 24-25; Ex. 1 at pp. 29, 34-37; Ex. 3 at p. 54; Ex. 4 at pp. 10-12, 17-21, 31, 51, 56-60; and Fred Swift's Dep., Ex. 9 at pp. 40-41. 59-60.

TIG represents that Local 450's first complaint about continuing to use the established procedure came in January 2013 in Local 450's letter from counsel terminating the July 2012 agreement. Ex. 1 at p. 40; Ex. 9, p. 41; Ex. 4 at pp. 21, 31, and 59; Ex. 3, p. 70; Doug Selwyn's January 28, 2013 letter, Ex. 10. Although Local 450 had the right under the July 2012 agreement to grieve and arbitrate TIG's purported improper adherence to the prior notification procedure, Local 450 did not file a grievance before it unilaterally rescinded the agreement on January 28, 2013. Ex. 3 at pp. 56-58; Ex. 9, pp. 114, 117; Local 450's October 30, 2013 Grievance, Ex. 11. TIG explains that in the July 2012 Agreement, a wage rate schedule attached as Appendix A was to govern the bargaining unit of employees as those "referred by Local 450 to Turner." Ex. 8, Art. I § 2. Morain testified that he only tried

to obtain referral of five operators from Local 450 on October 22, 2012.  Ex. 1 at pp. 31-32.  Maher told Morain that Local 450 would not supply any operators for the job, so the wage rates identified in Appendix A were never used and TIG continued to pay Local 406 wage rates whenever it sent Local 406 operators to Texas, as it had done under the 1995 and 2010 Local 406/450 Crane Rental Agreements and the 2010-2011 PLAs.  Ex. 2 at pp. 28-30, 35.

After the parties were unable to resolve the pay rate issue, Local 450 served an October 30, 2012 Grievance on TIG regarding interpretation of the pay wage provision, with Local 450 arguing that under the agreement TIG had to pay Local 406 operators at Local 450's slightly higher hourly wage rates for the work performed in Texas.  Grievance Form Fact Sheet, Ex. 11.  The parties submitted the grievance to the FMCS, which scheduled a January 15, 2013 mediation in Houston.  Lauve and Morain represented TIG, and Maher and Swift represented Local 450 at the mediation, but the parties were unable to reach an agreement.  Although Maher threatened to "tear up" the July 2012 agreement (Ex. 2 at pp. 40-41; Ex. 9 at p. 116), he closed the mediation by telling TIG that he had a semi-annual meeting with the IUOE General President in the next week and would discuss the pay dispute and get back with TIG on a possible resolution.  Ex. 1 at pp. 53-54; Ex. 2 at pp. 41-42.  TIG never heard back from Local 450 on the pay dispute.  Ex. 53-54.

Instead on January 28, 2013 Local 450's attorney sent the

unilateral termination letter stating that the July 2012 "Agreement has failed to be consummated and is herewith terminated." Ex. 10. The letter relied on the unresolved pay dispute grievance discussed at the mediation on January 15, 2013 and two new issues: that TIG did not try to use Local 450 workers to staff any of the Texas projects and (2) that TIG had not given email notice to Local 450 when TIG sent Local 406 workers to Texas. Two weeks later, Local 450's Fred Swift called Local 406's Carlos Benoit and Local 406 Operators on whom TIG relied and told them that they were no longer cleared to work in Texas and that Local 450 would file charges against them if they did. Swift Dep., Ex. 9 at pp. 125, 134-35; Benoit Dep., Ex. 4, at pp. 18-19, 21. When TIG learned of the threat of charges and fines, it met with the 406 operators and told them TIG would not request that they go back to Texas in light of these threats against them. Ex. 1 at pp. 61, 63-66, 81.

Thus TIG had to immediately recruit, hire, train, and supervise large groups of replacement operators for its work in Texas. Ex. 1 at pp. 83, 88-89, 91, 94-95, 98, 102-03, 106-07. TIG maintains that it would not have incurred the damages but for Local 450's unilateral rescission of the July 2012 Agreement and its subsequent threats to the Local 406 operators on whom TIG relied.

Local 450 asserts five defenses to TIG's breach of contract claim. First it contends that the contract was never implemented because Local 450 continued to rely on the pre-July 2012

notification procedure after July 2012 and to use the trigger procedure requiring email notice to Local 450's Business Manager. TIG responds that Local 450 ignores decades of legal precedent in contending that TIG's failure to comply with the technical notice requirements gave Local 450 its explicit contractual and legal duty to grieve and arbitrate this issue before unilaterally rescinding the agreement.  The Fifth Circuit and the Supreme Court have both held that a union's violations of no strike and work stoppage provisions in the parties' labor contracts do not give the employer the right to unilaterally terminate the contract without first arbitrating in accordance with the contract.  *United Steelworkers of America v. America Int'l Aluminum Corp.*, 334 F.2d 147, 150-51 (5th Cir. 1964)(*citing Local Union No. 721 v. Needham Packing Co.*, 376 U.S. 247 (1964)), *cert. denied*, 379 U.S. 991 (1965)("[T]he Employer's . . . allegations by way of defense . . . that the union breached the nostrike clause . . . did not release (the Employer) from its duty to arbitrate the union's claim that employees had been wrongfully discharged.").  Other Circuits agree.  *Trailways of New England v. Amalgamated Assoc. of Street, Electric Railway and Motor Coach Employees*, 343 F.2d 815, 817-18 (1st Cir. 1965)(rejecting employer's attempt to rescind agreement based on union's material breach without first arbitrating that dispute); *United Steelworkers of America, AFL-CIO-CLC v. NLRB*, 530 F.2d 266, 280 (3d Cir. 1976)(holding that a strike in breach of a collective bargaining

-38-

contract does not automatically give the employer the right to terminate the contract when both legal and contractual remedies short of termination were available to the employer), *cert. denied sub nom Dow Chemical Co. v. United Steelworkers of America, AFL-CIO-CLC*, 429 U.S. 834 (1976).

In *Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionary Workers, AFL-CIO*, 370 U.S. 254, 263-64 (1962)(holding as a matter of policy that an employer must arbitrate his claim against the union where the broad arbitration provision included "all complaints, disputes, or grievances between [the parties] involving questions of interpretation or application of any clause or matter covered by this contract or any act or conduct or relation between the parties hereto, directly or indirectly" and did not "exclude claims or complaints of the employer [*id.* at 257]") rejected the idea that the common law material breach doctrine applied in the labor contract context with the result that parties to such an agreement could no longer rescind those agreement without first grieving and arbitrating their dispute:

> In passing § 301 [of the LMRA], Congress was interested in the enforcement of collective bargaining contracts since it would "promote a higher degree of responsibility upon the parties to such agreements and will thereby promote industrial peace" (S. Rep. No. 105, 80th Cong., 1st Sess. 17). It was particularly interested in placing sanctions behind the agreements to arbitrate disputes. The preferred method for settling disputes was declared by Congress to be (f)inal adjustment by a method agreed upon by the parties (§ 203(d) of the Act, 29 U.S.C. § 173(d) . . . . "That policy can be effectuated only if the means chosen by the parties for settlement of

their differences under a collective bargaining agreement is given full play." Under our federal labor policy, therefore, we have every reason to preserve the stabilizing influence of the collective bargaining contract in a situation such as this. [citations omitted]

In *United Steelworkers v. NLRB*, 530 F.2d at 280, the Third Circuit repeated this policy in holding that "strict application of the doctrine of material breach derived from contract law is inconsistent with contemporary national labor policy." Rejecting the employer's unilateral rescission before first grieving and arbitrating the union's alleged contractual violation in light of a broad arbitration clause that covered "all complaints, disputes or grievances arising between" the parties,[16] and concluding that "strict application of the doctrine of material breach derived from contract law is inconsistent with contemporary national labor policy," the Third Circuit opined,

Here, the company had both legal and contractual remedies available to it short of contract termination. Legally, it could have compelled completion of the grievance procedure or filed a Section 301 damage suit. Under the contract it could have taken affirmative steps to have the underlying dispute submitted to arbitration. It did neither.

*Id.* Rather the Court determined that "it was the company's reluctance to arbitrate which precluded a peaceful resolution of the underlying dispute." *Id.* TIG notes that unlike the very serious consequences created by the violation of a no strike provision in

---

[16] In the instant case, too, Article X of the Agreement has a very broad grievance and arbitration provision: "Any dispute arising under the application or interpretation of the terms and conditions of this Agreement shall be resolved" by the grievance procedure.

these two cases, Local 450 is concerned only with getting actual notice of clearance from a different entity (Local 406) than the Agreement technically required.  As noted, Local 406 concedes it received actual notice of the clearance requests by phone from Local 406 rather than by email from TIG, as had been done for years.  If Local 450 actually believed it was prejudiced by receiving notice in this manner it could have easily submitted a grievance and TIG would have readily and easily simply sent out an email notice to Local 450.  Instead Local 450 unreasonably took an unlawful action, unilateral rescission of a valid agreement.

While the law clearly barred Local 450's rescission based on TIG's allegedly deficient notice, TIG argues that in the labor contract context, "[I]t is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements" because a labor contract "is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts . . . . [especially] when the agreement is resorted to for the purpose of settling a jurisdictional dispute over work assignments." *Transportation-Communication Employees Union v. Union Pacific R. Co.*, 385 U.S. 157, 160-61 (1967).  The Local 406/450 Clear-In Agreements stated that notice of clearance requests could be communicated from Local 406 to Local 450.  Ex. 5.  The March 2010 Clear-In Agreement renewed the

-41-

earlier version of the same agreement and both became the source of an accepted custom and practice used by Local 406 to relay clearance requests to Local 450.   *Id.* at pp. 2-3.   Thus there was an established custom and practice for providing notice in this way when the parties entered into the July 2012 Agreement that would support construing this custom and practice as an acceptable notice procedure.   *Union Pacific*, 385 U.S. at160-61.

TIG contends that Local 450's reliance on its contractual notice defense is fundamentally flawed.   Courts have long permitted the parties to a labor contract to modify the contract by conduct so long as the objecting party actually receives adequate notice. *Fly v. Newell-Rubbermaid, Inc.*, 50 Fed. Appx. 681, 689 (6th Cir. 2001)("As no one was prejudiced by the company's failure to deliver formal written notice in accordance with the contract's provisions, insistence upon compliance with a time line that the company and the Union apparently had agreed to waive would serve no purpose."); *Boston Celtics Ltd. Part. v. Shaw*, 908 F.2d 1041, 1046 (1st Cir. 1990)(although employer failed to provide contractually required written notice of demand for expedited arbitration, sufficient notice occurred where parties agreed to obtain quick decision through expedited arbitration proceedings and the absence of prejudice to the employee).

Local 450's second defense to TIG's breach of contract claim is that it lawfully repudiated the contract.   TIG also incorporates

-42-

by reference its April 22, 2013 Response (#12 at pp. 6-11) to argue that Local 450's repudiation defense is unlawful.  Although the Fifth Circuit has not yet addressed the effect of the NLRB's decision in *John Deklewa & Sons*, 282 N.L.R.B. 1375, 1987 WL 90249 (1987)(holding that the § 8(f) prehire agreements cannot be repudiated by either party before expiration), *enforcement granted by International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988), *cert. denied*, 488 U.S. 889 (1988), TIG argues that if the Fifth Circuit were to address the issue, it would agree with eight of the ten of Circuit Courts of Appeals that have ruled on the question, deferred to the Board, and adopted the *Deklewa* holding.[17]  *See* discussion in #12 at pp.7-11.

Local 450's third defense argues that TIG had to seek Local 450 employees as its first source of workers before using 406 workers, and thus the parties' contract cannot be interpreted to require

---

[17] In particular TIG cites *Mesa Verde Const. Co. v. N. Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1134 (9th Cir. 1988)(*en banc*), and  *N.L.R.B. v. Viola Industries-Elevator Div., Inc.*, 979 F.2d 1384 (10th Cir. 1992).  The First, Third, Seventh, Eighth, Eleventh and District of Columbia Circuit Courts of Appeals have also adopted the *Deklewa* holding that an 8(f) agreement is binding and enforceable during the duration of the contract and cannot be unilaterally repudiated by either party to the agreement.  *C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 357 (1st Cir. 1990); *Internat'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB*, 843 F.2d 770 (3d Cir. 1988); *NLRB v. Bufco Corp.*, 899 F.2d 608, 609, 611 (7th Cir. 1990); *NLRB v. W.L. Miller Co.*, 871 F.2d 745, 748 (8th Cir. 1989); *NLRB v. Triple A Fire   Protection, Inc.*, 136 F.3d 727, 731 n.4, 735 (11th Cir. 1998), *cert. denied*, 525 U.S. 1067 (1999); *United Broth. of Carpenters and Joiners of America, AFL-CIO v. Operative Plasterers' & Cement Masons' Intern. Ass'n of U.S. & Canada, AFL-CIO*, 721 F.3d 678, 694 & n.7 (D.C. Cir. 2013).

clearance of every Local 406 member that TIG sent to work in Texas. TIG challenges Local 450's interpretation of the clearance provision. The parties had incorporated the same referral procedures on which Local 450 now relies in the 2010 and 2011 PLAs and Local 450 did not argue under either agreement that TIG had to use workers from Local 450 before it used 406 workers. Article VII, § 1 of Exs. 6 & 7; Ex. 1, pp. 18-20; Ex. 2, p. 20. Rather, on the Huntsman Chemical and Exxon jobs TIG only employed Local 450 workers when Local 406 could not supply sufficient workers. Ex. 1 at pp. 18-20. If the language of the Preamble to the July 2012 Agreement regarding Local 450's duty to clear is ambiguous, the Court can look to the parties past conduct and how they construed the similar provisions under the 2010 and 2011 PLAs. *Union Pacific*, 385 U.S. at 160-61; *BNSF Railway Co. v. Brotherhood of Maintenance of Way Employees*, 550 F.3d 418, 425 (5th Cir. 2008)(CBA may be interpreted by looking to implied terms as well as the parties' practice, usage, and custom); *United Paperworkers Int'l Union v. Champion Int'l Corp.*, 908 F.2d 1252, 1256 (5th Cir. 1990)("[T]he construction and application of a collective bargaining agreement's terms cannot be strictly confined by ordinary principles of contract law. The provisions of a labor contract may be more readily expanded by implication than those of contracts memorializing other transactions."); *Briggs & Stratton Corp. v. Local 232 of Allied Industrial Workers*, 36 F.3d 712, 716 (7th Cir.1994)("[C]ollective

-44-

bargaining agreements also may be altered by course of performance."), citing Matuszak v. Torrington Co., 927 F.2d 320, 324 (7th Cir. 1991)("[T]he parties to a CBA may tacitly acquiesce to an amendment of the agreement through their course of dealing.").

TIG points out that there is no dispute that Local 450 Business Representative Fred Swift knew that Local 406 workers were being cleared to work in Texas under the July 2012 Agreement and that Local 450 could easily have determined from its own records that Local 450 workers were also being used on the same sites.  If they were not, Local 450 could have raised and/or grieved the issue under the Agreement, but it chose not to and instead attempted to unilaterally rescind the Agreement in violation of applicable law.

Pointing out that Local 450's January 28, 2012 letter simultaneously denied the existence of an enforceable agreement and repudiated the Agreement (#1, Ex. B), TIG addresses as Local 450's fourth defense to the breach of contract claim that even if the July 2012 Agreement were enforceable and could not be repudiated before June 30, 2013, Local 450 can still compel arbitration of TIG's complaint.  Local 450's first argument for dismissal is that the July 2012 Agreement is not binding; along with its January 28, 2013 letter of repudiation, that assertion means that it was "futile" for TIG to even try to use the grievance procedure in dealing with 450's breach.  See, e.g., United Slate, Tile and Composition Roofers Assoc. v. G&M Roofing & Sheet Metal Co., 732 F.2d 495, 501 (6th Cir.

-45-

1984)(when a party to a labor agreement denies its binding nature, other party has no duty to pursue agreement's arbitration process because doing so is futile under applicable law).  Similarly when a party repudiates a labor agreement, it cannot thereafter seek to compel arbitration arising out of the same agreement.  *Steam Press Holdings, Inc. v. Hawaii Teamsters & Allied Workers Union*, 302 F.3d 998, 1010-11 (9th Cir. 2001)(employer's pre-strike repudiation of agreement in order to gain leverage over union resulted in estoppel of employer's right to subsequently rely on arbitration provision during litigation); *Reid Burton Constr. Inc. v. Carpenters Dist. Council of Southern Colorado*, 535 F.2d 598, 600, 604 (10th Cir. 1976)(finding local union could be estopped from simultaneously asserting right to compel arbitration of employers' breach of contract claim where local union's answer denied that it was party to agreement upon which employer's claim rested), *cert. denied*, 429 U.S. 907 (1976).  Thus the Court should deny Local 450's motion to compel.

Finally, Local 450's fifth defense is that TIG has not asked for money damages for Local 450's breach and that since the contract has now expired, TIG's claim is moot.  Calling these claims "frivolous at best," TIG again points out that its Amended Complaint expressly sought "all other remedies to which it may be justly entitled" and asked the Court to grant it "such further relief to which it may be entitled."  #11, ¶22.  Federal Rule of Civil

Procedure 54(c) permits the Court to grant TIG all the relief to which it may be entitled under the applicable law. *See Brown v. Burr-Brown Research Corp.*, 378 F.2d 822, 824 (5th Cir. 1967)(complaint's prayer "for such other and further relief to which plaintiff may be entitled" provided the court with authority to enter judgment for damages). TIG notes that both parties could have re-opened negotiations on wages/benefits by asking for such a re-opener on May 1, 2012, and if they still could not reach an agreement, the Agreement could have ended on July 1, 2013. Art. XXV of Ex. 8; Ex. 2 at pp. 33-34; Ex. 1 at pp. 78-79, 106-07. Nevertheless Local 450's unlawful unilateral rescission prevented TIG from exercising its right to negotiate. Yet Local 450 now seeks a reward for its unlawful rescission in a damages cap based on the possibility that the parties would not have reached a resolution on the wage dispute before July 1, 2013. TIG highlights the fact that Local 450 does not cite any authority for such a right under these circumstances.

Finally, regarding TIG's tortious interference claim, Local 450's threats of charges and fines to Local 406 members satisfy the elements of the independent tort of duress under Texas law. To recover for economic duress or business coercion, a plaintiff must show *inter alia* that the defendant threatened to do something it has no legal right to do. *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W. 2d 830, 837 (Tex. App.--Houston

-47-

[1st Dist.] 1999).  Because Local 450 did not lawfully rescind the Agreement on January 28, 2012, it therefore lacked the legal authority to threaten those Local 406 members with charges and fines during February 2012.  Moreover, the IUOE Constitution gives Local 450 the ability to enter into a clearance agreement with an employer that did not strictly comply with the typical "keyman" clearance agreement language from the Constitution.  *See* Ex. 13 at pp. 47-49, Art. XV, § 3(a) ("Nothing in the above three paragraphs shall limit a Local Union's ability, in exercising its discretion to clear in members of other Local Unions, to mutually agree with an employer to a different key employee arrangement.").  Once Local 450 executed the July 2012 Agreement with TIG, Local 450 lacked the legal authority to unilaterally rescind it and thereafter make unlawful threats to Local 406 members.  Thus TIG's tortious interference claim survives.

Local 450 contends that the unlawful threats alleged in support of TIG's tortious interference claim could constitute unfair labor practices under 29 U.S.C. § 158(b)(1)(A) and that such a possible § 8(b)(1)(A) violation triggers a *Garmon* preemption under *San Diego Building Trades Council, Millmen's Union v. J.S. Garmon, J.M.*, 399 U.S. 236 (1959).  Objecting, TIG notes that as the party claiming *Garmon* preemption, Local 450 "bears the burden of proving that the challenged conduct is arguably prohibited" by the NLRA.  *E.I. DuPont de Nemours & Co. v. Sawyer*, 517 F.3d 785, 793 (5th Cir. 2008),

-48-

*citing Garmon*, 359 U.S. 236.  TIG maintains that Local 450 fails to explain what facts in its Amended Complaint establish the existence of a § 8(b)(1)(A) violation, 29 U.S.C. § 158(b)(1)(A) of the NLRA, by showing that Local 450's threats were motivated by an intent to retaliate against threatened operators for having exercised "rights guaranteed in Section 157 of this title."  Section 8(b)(1)(A) only prohibits a union from retaliating against an employee for having engaged in concerted activities or for refraining from engaging in concerted activities, protected by Section 7 of the NLRA, 29 U.S.C. § 157.  *Internat'l Union of Operating Engineers, Local 513, AFL–CIO v. N.L.R.B.*, 635 F.3d 1233, 1234-36 (D.C. Cir. 2011); *Pacific Maritime Assoc.*, 358 NLRB No. 133 (2012)(A section 8(b)(1)(A) violation only exists when there is evidence that a union's reprisal against its member occurred due to member having engaged in concerted protected activity within meaning of Section 7); *Carpenters Union Local 25 v. NLRB*. 769 F.2d 574, 580 (9th Cir. 1985)("Because section 8(b)(1)(A) protects the exercise of Section 7 rights, a union violates Section 8(b)(1)(A) if it coerces a member into joining the union or threatens harm for failure to join."). There are no allegations in the Amended Complaint that suggest the threatened operators had engaged in concerted protected activity or had refrained from engaging in such activities before Local 450 allegedly threatened them. #11, ¶¶ 12-17.  Therefore, because there is no allegation that the operators exercised rights guaranteed

under section 157, there is no legal basis to claim a violation of 29 U.S.C. § 158(b)(1)(a). *IUOE Local 513*, 635 F.3d at 1234-36; *Pacific Marine*, 358 NLRB No. 133. Thus Local 450 cannot meets its burden to show "that the challenged conduct is arguably prohibited" by the NLRA, as is required for a *Garmon* preemption. *DuPont*, 517 F.3d at 793.

Next, even if Local 450 had met its burden to show that Local 450 violated the non-450 crane operators' rights under section 8(b)(1)(A), Local 450 does not show how TIG has legal standing on which to assert such a violation on behalf of the affected operators. *See Int'l Union of United Auto Workers v. Dana Corp.*, 278 F.3d 548, 559 (6th Cir. 2002)(employer has no legal standing to assert Section 7 rights belonging to its employees); *Healthcare Assoc. of New York v. Pataki*, 471 F.3d 87, 97 (2d Cir. 2006)(employers had no standing to assert rights arising under Section 7 because such rights belonged to employees alone); *Branson v. Greyhound Lines, Inc.*, 126 F.3d 747, 751 (5th Cir. 1997)(Section 7 only protects the rights of employees to organize, strike, and collectively bargain).

TIG further notes that the Supreme Court has recognized an exception to *Garmon* preemption where the party asserting a state-law claim has no legal standing to assert a separate NLRA violation against that union for the NLRB. *Sears, Roebuck & Co.*, 436 U.S. at 201-03 (because employer Sears had no legal ability to assert

"federally protected" nature of union's conduct to NLRB and only the union could bring it before the Board by filing an unfair labor practice charge that Sears interfered with the union's § 7 right to picket peacefully but refused to do so, Sears lacked an "acceptable means" of doing so, so its state-law trespass claim was not preempted by *Garmon*).   "The primary-jurisdictional rationale justifies pre-emption only in situations in which an aggrieved party has a reasonable opportunity to invoke the Board's jurisdiction himself or else to induce his adversary to do so." *Id.* at 201.  *See also John S. Griffith Construction Co. v. United Bhd. of Carpenters & Joiners of S. Cal.*, 785 F.2d 706, 711 (9th Cir. 1986)("[A] district court may take jurisdiction if a party has no standing to bring his case before the Board. . . . . Under those circumstances we have . . . found the primary jurisdiction doctrine inapplicable.").  Comparing itself to the employers in *Sears* and *Griffin Construction*, TIG, lacking standing to assert claims on behalf of the non-450 crane operators, maintains it has no ability to obtain the Board's ruling on Local 450's violation of the threatened operators' Section 7 rights, so *Sears* precludes Local 450's right to assert *Garmon* preemption and thus it cannot rely on *Garmon* preemption.

TIG further argues that its tortious interference claim[18] is

_____

[18] To prevail on a claim for tortious interference with prospective business under Texas law, a plaintiff must show that (1) there was a reasonable probability that the parties would have

-51-

not identical to the section 8(b)(1)(A) dispute that the non-450 operators could bring to the NLRB, which would require allegations that the operators engaged in protected concerted activity and Local 450 directed the threats at them in retaliation, none of which is relevant to the tortious interference claim.   For TIG's tortious interference claim, Local 450's motivation for its tortious conduct is irrelevant.  *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W. 3d 711, 724 (Tex. 2001); *Texas Beef Cattle Co. v. Green*, 52 S.W. 3d 711, 724 (Tex. 2001).   The elements of a tortious interference claim are

---

entered into a contractual relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant committed such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference. *Faucett v. Chantos*, 322 S.W. 3d 901, 914 (Tex. App.--Houston [14th Dist.] 2010, no writ), *citing Baty v. ProTech Ins. Agency*, 63 S.W. 3d 841, 860 (Tex. App.--Houston [14th Dist.] 2001. pet. denied).

In *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W. 3d 711, 726 (Tex. 2001), the Texas Supreme Court clarified the nature of the tort of tortious interference with prospective business relations under Texas common law:

> [T]o recover for tortious interference with a prospective business relation, a plaintiff must prove that the defendant's conduct was independently tortious or wrongful.  By independently tortious we do not mean that the plaintiff must be able to prove an independent tort.  Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort. Thus, for example, a plaintiff may recover for tortious interference from a defendant who makes fraudulent statements about the plaintiff to a third person without proving that the third person was actually defrauded. . . . Likewise, a plaintiff may recover for tortious interference from a defendant who threatens a person with physical harm if he does business with the plaintiff.  The plaintiff need prove only that the defendant's conduct toward the prospective customer would constitute assault.  Also, a plaintiff could recover for tortious interference by showing an illegal boycott, although a plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful. Conduct that is merely "sharp" or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations . . . .

different than those for a section 8(b)(1)(A) violation.[19]  Moreover the focus of a NLRB proceeding would be on Local 450's conduct toward the non-450 crane operations, while the focus of TIG's tortious interference claim is Local 450's conduct toward TIG.

Regarding Morain's admission that TIG's damages were speculative, TIG asserts that this testimony was taken out of context and is incomplete.  Before this colloquy Local 450's counsel had already questioned Morain about TIG's damages and Morain's explanation fills fifteen pages about what TIG had to do because of

---

[19] TIG asserts that its tortious interference claim depends on evidence demonstrating four facts:  (1) a reasonable probability that it would have entered into a business relationship with the non-450 crane operators; (2) that Local 450 committed an independently tortious or unlawful act that prevented TIG's relationship from occurring; (3) that Local 450 acted with conscious desire to prevent TIG's relationships from occurring or that 450 was substantially certain that its acts would prevent such relationships from occurring; and (4) TIG suffered actual harm or damages as a result of 450's interference.  *North Cypress Med. Center Operating Co. v. Gallagher Benefit Services*, No. 4:11-cv-00685, 2012 WL 2870639 at *6 (S.D. Tex. July 11, 2012).  The NLRB would not be concerned with these elements of proof.  An NLRB proceeding would focus on Local 450's conduct toward the non-450 crane operators, while the focus of TIG's tortious interference claim is Local 450's conduct toward TIG.

The Supreme Court and the Fifth Circuit have concluded that for *Garmon* preemption the state tort claim must be identical to the controversy presented to the NLRB:

> The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in *Garner*) or different from (as in *Farmer*) that which could have been, but was not, presented to the Labor Board.  For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

*Sears*, 436 U.S. at 197.  *See also Windfield v. Groen Div., Dover Corp.*, 890 F.2d 764, 769-70 (5th Cir. 1989)(employing identical inquiry test for *Garmon* preemption); *E.I. Dupont De NeMours & Co. v. Sawyer*, 517 F.3d 785, 793-94 (5th Cir. 2008).

Local 450's January 28, 2013 letter of termination and the damages that had been incurred and would not have been incurred but for Local 450's actions. Morain Dep., Ex. 1 at pp. 75-80, 82-83, 88-89, 91, 94, 98, 102-03, and 106. Thus the damages defense also fails.

After reviewing the record, the Court finds that TIG is correct and that Local 450 have misrepresented Morain's testimony, which clearly describes extensive damages incurred by TIG.

### Local 450's Reply (#61)

Local 450 argues that the unique nature of the agreement at issue is that it did not require either party to do anything until and unless TIG used the trigger procedure, which TIG wrote into the contract and which nevertheless it never invoked. Local 450 insists it could not have breached a contract that it never used, or for damages to flow from a contract that was never used. Although TIG tries to characterize its failure as continued reliance on the pre-July 2012 notification procedure, TIG insists there was no notification obligation in prior agreements between the parties, but only an obligation on the part of members of Local 406 working for TIG in Texas to obtain clearance to work in Local 450's jurisdiction. Moreover there was no past practice with respect to project identification in the trigger procedure.

Local 450 maintains that a pre-hire agreement in the construction industry can be unilaterally repudiated. The cases cited by TIG involve unilateral rescission of collective bargaining

agreements involving unions selected as representatives by the majority of employees in an appropriate bargaining unit under 29 U.S.C. § 158(f). TIG never alleged that Local 450 had majority status, while Morain stated that the Texas crane rental industry is mostly "open shop." Morain Dep., Ex. Q, at 59:14-60:10 and ex. 3. Local 450 reiterates that the Fifth Circuit has not yet addressed whether prehire agreements under 29 U.S.C. § 158(f) may be unilaterally repudiated.

Local 450 argues that TIG, after the contract expired, now seeks money damages under it even though it failed to do so in its pleadings. TIG represented to the Court that the agreement expired on June 30, 2013, a judicial admission that estops it from asserting a different position now. In its pleadings it requested only a declaratory judgment, injunctive relief, attorney's fees and costs for its breach of contract claim. Instead it limited its request for damages to its tort claim. TIG should be limited to the relief it pleaded for.

Finally Local 450 points out that TIG pleaded its tortious interference claim in the alternative, in the event that the Court found Local 450's repudiation of the agreement effective. TIG has conceded that if Local 450 did not lawfully rescind the agreement, it lacked the legal authority to threaten Local 406 members with charges and fines in February 2013. #60 at p. 16. Nor has TIG rebutted Local 450's showing in its motion for summary judgment that

-55-

its actions do not satisfy the elements of the tort of duress because its representatives have an absolute contractual right under the IUOE Constitution to threaten to file and to file disciplinary charges against any IUOE member at any time for any reason.   Thus the tort claim should be dismissed.

### Court's Decision

After reviewing the extensive briefing and the record, the Court finds that TIG has raised genuine issues of material fact as to all of Local 450's arguments and cited legal authority supporting TIG's positions, and therefore the motion for summary judgment should be denied.

To Local 450's contention that the July 2012 contract was never implemented because TIG did not strictly comply with the trigger procedure, but emailed 406 and relied on it to inform Local 450's Business Manager to clear in the 406 members, instead of emailing Local 450's Business Manager directly as required by the contract, TIG shows the long history, practice and custom of such notice under previous agreements between Local 450 and Local 406 for clearing in 406 members to work in Texas for TIG.   TIG points out that the first complaint it received from Local 450 regarding its use of the notification procedure they had used for years was Local 450's unlawful January 2012 unilateral termination letter.   Citing substantial authority, TIG emphasizes that Local 450 failed first to follow the grievance and arbitration procedure under the July

-56-

2012 agreement regarding the trigger procedure prior to unilateral rescission, as required by decades of case law summarized by TIG. Citing case law highlighting the rule that material breach of contract law is inconsistent with national labor policy and that it is well established that parties to a labor contract may modify the contract by conduct as long as the objecting party receives adequate notice, TIG also shows that Local 450 had actual notice of clearance from Local 406. Given the broad grievance and arbitration provision in the July 2012 agreement, Local 450 must pursue its contractual remedy to grieve and arbitrate its claims involving interpretation of the agreement before seeking to unilaterally repudiate the agreement based on an alleged material breach by TIG.

As this Court opined in its previous Opinion and Order (#62 at pp. 17-19),

> In three cases known as the *Steelworkers Trilogy*, all reaffirmed in *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986), the Supreme Court established four fundamental principles underlying arbitration issues under collective bargaining agreements. *Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); and *Steelworkers v. Enterprise Wheel & Car Corp.* 363 U.S. 593 (1960). First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT&T*, 475 U.S. at 648; *Warrior & Gulf*, 362 U.S. at 582. The second, "which follows inexorably from the first," is the court decides whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance unless the parties "clearly and unmistakably provide otherwise." *AT&T*, 475 U.S. at 649, *citing Warrior & Gulf*, 363 U.S. at 582-83. Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is

not to rule on the potential merits of the underlying claims. . . . [E]ven if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided not by the court  asked to order arbitration, but as the parties have agreed, by the arbitrator."  *Id.* at 649-50, *citing Am. Mfg.*, 363 U.S. at 568.  The last principle, establishing a presumption of arbitrability, is, "The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."  *AT&T*, 475 U.S. at 650.  "'[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.'"  *Id., quoting Warrior & Gulf*, 363 U.S. at 582-83.  The presumption applies especially where the collective bargaining agreement contains a broad arbitration clause, e.g., one providing for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation thereunder."  *AT&T*, 475 U.S. at 650.  "In such cases, '[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'"  *Id., quoting Warrior & Gulf*, 353 U.S. at 584-85.  The Fifth Circuit regularly applies this four-principle framework in determining arbitrability under labor agreements.  *See, e.g., Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union Local No. 4-2001 v. ExxonMobil Refining & Supply Co.*, 449 F.3d 616, 619-20 & n.2 (5th Cir. 2006).  Here, the broad arbitration clause contains no express exclusions and states, "Any dispute arising under the application or interpretation of the terms and conditions of this Agreement shall be resolved in accordance with" Article X, which in turn provides that any dispute not settled in the first two steps of the grievance process can be submitted to arbitration by either Plaintiff or Defendant. #1, Ex. A at pp. 3-4.  Because it lacks "any express provision excluding a particular grievance from arbitration, only 'the most forceful evidence of a purpose to exclude the claims from arbitration can prevail." *AT&T*, 475 U.S. at 650.  A review of the original complaint reveals that all of Plaintiff's claims are covered by the arbitration provision in the document which Plaintiff seeks to have the Court declare is a valid contract that has not been

repudiated by Local 450.

As for Local 450's unilateral repudiation of the July 2012, TIG reasonably relies on the NLRB's *Deklewa* decision, which has been embraced by the First, Third, Seventh, Eighth, Ninth, Tenth, Eleventh, and District of Columbia Circuit Courts of Appeals, holding that § 8(f) agreements are not unilaterally voidable prior to their expiration date.   The fact that the Fifth Circuit has not directly addressed the question yet does not mean that it would reject the *Deklewa* holding.   Indeed, only the Fourth Circuit has done so, based on a conflicting ruling of a prior panel of that appellate court.   *American Automatic Sprinkler System*, 163 F.3d at 215, *citing Industrial Turnaround v. NLRB*, 115 F.3d 248, 254 (4th Cir. 1997), *citing Clark v. Ryan*, 818 F.2d 1102 (4th Cir. 1987).

TIG has also raised issues regarding Local 450's insistence that the July 2012 agreement required TIG to hire Local 450 workers before using Local 406 workers.   Again relying on accepted past practices of the parties and supporting case law, TIG points out that similar referral procedures were included in the 2010 and 2011 PLAs and that TIG only used workers from Local 450 when it could not obtain enough workers from Local 406 on both the Hunstman Chemical and the Exxon jobs, all without objection from Local 450.   Again, Local 450 could have, but chose not to, pursue the grievance procedure under the July 2010 agreement.

As for Local 450's argument that TIG failed to pray for damages

for its breach of contract claim and that the expiration of the July 2012 agreement moots its demand for declaratory and injunctive relief, the Court agrees with TIG that its express requests for "all other remedies to which it may be justly entitled" encompasses money damages. *See* 10 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, and Adam N. Steinman, *Federal Practice & Procedure* § 2664 (database updated Apr. 2014)(Under the second sentence of Rule 54(c)("Every other final judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."), "[i]f defendant has appeared and begun defending the action, adherence to the particular legal theories of counsel that may have been suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not.  The only exception to this rule is if plaintiff's failure to demand the appropriate relief has prejudiced his adversary." *See also Bauhaus USA, Inc. v. Copeland*, 292 F.3d 439, 448 (5th Cir. 2002)("[T]he remedies that a federal court may bring to bear are not constrained by a litigant's prayer for relief; rather, the Federal Rules of Civil Procedure command the federal courts to grant relief that complainants do not demand when such relief is appropriate," citing Rule 54(c) and 8), *overruled on other grounds*, *ACS Recovery Services, Inc. v. Griffin*, 723 F.3d 518 (5th Cir. 2013); *Matter of*

*Hannover Corp. of America*, 67 F.3d 70, 75 (5th Cir. 1995).  As TIG points out, Local 450 has not claimed prejudice because it has had ample opportunity and discovered all of the factual basis underlying TIG's breach of contract damages request.  As noted earlier, Morain testified extensively about TIG's damages because of Local 450's January 28, 2013 letter of termination.  Morain Dep., Ex. 1 at pp. 75-80, 82-83, 88-89, 91, 94, 98, 102-03, and 106.  Moreover should the jury find that the July 2012 was unilaterally rescinded by Local 450's letter, TIG's alternative claim for tortious interference with prospective business relations would be viable.  Nor, for the reasons indicated above by TIG, is it preempted under *Garmon*.

Accordingly, for these reasons, the Court

ORDERS that Local 450's motion for summary judgment (#56) is DENIED.

**SIGNED** at Houston, Texas, this  20th  day of  May , 2014.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE