IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TURNER INDUSTRIES GROUP, LLC,    §
                                 §
            Plaintiff,           §
                                 §
VS.                              §    CIVIL ACTION H-13-0456
                                 §
INTERNATIONAL UNION OF OPERATING§
ENGINEERS, LOCAL 450,            §
                                 §
            Defendant.           §

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

The above referenced action seeks damages and a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Plaintiff Turner Industries Group, LLC ("TIG") has an enforceable labor contract with Defendant International Union of Operating Engineers ("IUOE"), Local 450 ("Local 450") and that Local 450 is and has been in an ongoing material breach of that agreement by failing to clear in members of IUOE Local 406 to work on certain construction projects that TIG had in Texas. Alternatively, if the Court finds that either the agreement had never been consummated or that Local 450 terminated the contract on January 28, 2013, TIG seeks damages for tortious interference with its prospective business relations under Texas common law.

This case was tried to the bench from May 27th-29th, 2014. The Court now enters the following finding of facts ("FF") and

conclusions of law ("CL").[1]

### Findings of Fact on Liability

1.  TIG is a Louisiana Limited Liability Company based in Baton Rouge, Louisiana, with geographical jurisdiction over the whole of Louisiana under the Constitution of the IUOE,[2] and licensed to do business in Texas.  TIG had for over thirty years provided industrial construction and maintenance/turnaround services, involving *inter alia* large crane operators through its Equipment and Rigging Division, to the Gulf Coast petrochemical, refining, and paper pulp industry, including to job sites in and near Houston, Texas.  TIG uses experienced crane operators certified by the National Commission for Certification of Crane operators, because when operated unsafely, large cranes can cause substantial damage.  TIG's crane operators were members of IUOE Local 406 ("Local 406"), Defendant Local 450's Louisiana sister union, with which TIG had a longstanding collective bargaining relationship.

---

[1] As a threshold matter, with a fuller record from the trial and the opportunity to see and hear witnesses, the Court has modified some of its rulings since denying Local 450's motion for summary judgment.  Regarding any differences, the instant document controls. Federal Rule of Civil Produce 4(b) "authorizes a district court to reconsider and reverse its prior rulings on any interlocutory order 'for any reason it deems sufficient.'" *U.S. v. Renda*,709 F.3d 472, 479 (5th Cir. 2012), *quoting Saqui v. Pride Cent. Am., LLC*, 595 F.3d 206, 210-11 (5th Cir. 2007).

[2] Local unions of the IUOE are regulated by the International Union's Constitution, which provides that each local union has jurisdiction over a geographical area, indicated in the charter issued to each.  Defendant's Ex. #3. (Exhibits are trial exhibits, unless otherwise specified.)

That relationship and agreements between the two local unions governed TIG's employment of Local 406 members for jobs in Texas until they entered into the July 1, 2012 "Master Crane Rental Evergreen Project Labor Agreement Between Turner Industries Group, LLC Equipment Division and the International Union of Operating Engineers Local 450 for _____" (the "July 2012 Agreement" or "CBA")," at issue here.

2.   Defendant Local 450 is a local union of the IUOE, with offices in Dayton, Texas, and with geographical jurisdiction over 101 Texas counties,[3] including the Houston area.   It represents crane operators and other operating engineer employees with respect to their wages, hours, and other terms and conditions of employment with a number of employers, including TIG.

3.   Between 1995-2010, Local 450 and Local 406 entered into two Clear-In Agreements, the first in 1995 and the second in March 2010, to permit each Local's members to work in Texas and/or Louisiana for contractors like TIG.  *See* Plaintiff's Second Amended Exhibit List ("Plaintiff's Ex.") #4, 2010 Clear-In Agreement between Local 406 and Local 450 permitting freedom of movement into Local 450's jurisdiction. *See also* Pl.'s Ex. 2, letter from Local

---

[3] Local 450's Business Manager, Fred Swift, stated that there were 103 counties in the union's geographical jurisdiction. Trial Transcript ("TT") at p. 77.

406's Business Manager Roy L. Serpas, Jr. to TIG's Morain,[4] confirming that TIG "is accorded 'freedom of movement' with respect [to] bargaining unit employees covered by the collective bargaining agreement(s) ["CBAs"] between the parties." Under these Clear-In Agreements, traveling union members were responsible for contacting either their home local union or the local union where the work was to be performed to inform that local union about the details of their out-of-state work assignment. In actual practice, Local 406 members relied on TIG to email information to Local 406's Business Manager, Carlos Benoit ("Benoit"), about Local 406 members who were to work on job sites in Texas, and Benoit would then relay that information to Local 450's representatives. The two Clear-In Agreements provided that TIG would make apprenticeship contributions and pay union dues to Local 450 for the Local 406 members whom Local 450 cleared to work in Texas on jobs lasting for at least four days.

4. During the spring of 2009, Local 450 was placed under the supervision of the International Union, with Mike Wall ("Wall") as its supervisor. Wall then challenged TIG's right to employ Local 406 members for jobs in Texas without a labor agreement with Local 450. IUOE's Constitution states, "Members of one Local Union shall

---

[4] Morain superseded Dave Lauve as president of TIG's equipment division after Lauve retired. Because Lauve had more experience in contract negotiations than Morain, Lauve was retained as a consultant and came back to help negotiate the July 2012 Agreement at issue here. TT at pp. 172-73.

not seek employment, be employed, or remain at work at the craft within the territorial jurisdiction of another Local Union without the consent of such other Union." Local 450's Ex. #3 at p. 47.[5] Thereafter, the two Locals entered into two Project Labor Agreements ("PLAs"), each for a specific job site, the first in January 2010 for a job at Huntsman Chemical in Port Neches (Def.'s Ex. 33), the other in August 2011 for a job at Exxon's Baytown facility (Pl.'s Ex. 23). While both PLAs had required TIG to employ Local 450 members, TIG primarily used Local 406 operators and hired Local 450 members only when it could not fill positions with the Louisiana Local's members. A growing discord developed between members of the two Local unions.

5. TIG and Local 450 subsequently entered into a broader CBA, the July 1, 2012 "Master Crane Rental Evergreen Project Labor Agreement Between Turner Industries Group, LLC Equipment Division and the International Union of Operating Engineers Local 450 for _____", covering wages, hours, and working conditions for certain represented employees working more jobs in Texas for TIG. Plaintiff's Second Amended Exhibit List ("Plaintiff's Ex."), #3. Without the help of attorneys, TIG's Dave Lauve ("Lauve"), former president of TIG's equipment division, drew up the contract

---

[5] Both parties have submitted a number of the same documents as trial exhibits. The Court's citation to any one side's exhibit is merely for the Court's convenience and no significance should be attached to the choice.

based on Local 450's standard labor contract terms and the terms of the Clear-In Agreements between Locals 450 and 406.  TT at p. 272. In uncontroverted testimony, Lauve explained the blanks in the title were a solution to TIG's refusal to sign Local 450's master contract that would have covered all of TIG's work in 450's jurisdiction because TIG wanted to retain its ability to do non-union jobs in non-union yards in Texas; the blanks allowed TIG to choose which contract(s) the agreement would apply to.  TT at pp. 287-88.  The signature page states that the July 2012 Agreement is for a project starting July 1, 2012.

     6.  The notification procedure for Local 406 workers cleared to work in Texas changed under the July 2012 CBA.  The July 2012 CBA required that TIG email Local 450's Business Manager, Mark Maher ("Maher"), directly, about jobs to be worked by Local 406 operators in Local 450's area in Texas, rather than going through Local 406's Business Manager, Benoit.  Nevertheless TIG continued its past practice and custom of sending the information to Benoit, who then forwarded it to representatives of Local 450, specifically to Local 450's Business Representative Fred Swift ("Swift"), Maher's assistant, by telephone.  Local 450 did not complain about use of this past practice to TIG until Local 450's attorney sent a letter dated January 28, 2013 stating that Local 450 was unilaterally terminating the July 2012 CBA.  TT at p. 177, Morain's testimony.  Significantly, Local 450 did not file a grievance nor

seek to arbitrate this notice issue.  See trial testimony of Mark
Maher, TT at p. 124 (conceding that no grievance was filed, but
that if he had filed a grievance on the notification issue, it
could have been easily fixed by having TIG send the email notices
to him).

7.  Meanwhile Local 450's Fred Swift did file a grievance on
October 30, 2012 under the July 2012 CBA, objecting only that the
pay rate and benefits for Local 406 operators working in Texas
should be Texas wages, i.e., the same as those for Local 450
members, under Appendix A of the agreement.[6]  In that grievance,
Swift expressly stated that the CBA "was signed on July 1, 2012 and
enforceable as of that date."  Defendant's Ex. #2.

8.  TIG requested referrals from Local 450, but never received
any, so TIG never used the wage rates in Appendix A, which were
conditioned upon the existence of referrals by Local 450.  Instead
relying on traveling members of Local 406 to fill its needs in jobs
in Texas, TIG continued to pay Local 406 rates, as it had under the
two Clear-In Agreements and the two PLAs.

9.  The parties failed to resolve the pay dispute at a January

---

[6] Article XIII ("Wage Rates and Benefit Contributions
Rates"), Section 1 states,

   The classifications of employment, minimum wage rates
   and fringe benefits required by this Agreement shall be
   in accordance with APPENDICES A and B, which are
   incorporated into and made a part of this Agreement.
   Employees hall receive no less than the wages and
   benefits rates listed in APPENDICES A and B.

18, 2013[7] "mediation" session before the Federal Mediation and Conciliation Service in Houston, in which Lauve and Morain represented TIG, and Maher and his assistant, Swift, represented Local 450.[8]  The parties did not resolve the pay issue during the meeting.  There is a dispute whether or not at the end of the meeting Lauve told Maher that he had to "get back and talk with corporate[9]" and would get back with TIG on a possible resolution. TT at p. 86, 180, 181, 388-89.  That disagreement is immaterial because the January 18, 2013 meeting was not a formal mediation and did not resolve the issue, because the parties subsequently did not meet again to further discuss the problem, and because neither party pursued formal mediation of the pay issue.  Moreover at trial Maher conceded that he, as well as Local 450, had the right to continue the grievance process and to submit the issue for arbitration, but did not exercise that right.  TT at 121-23.

10.  In the letter dated January 28, 2013 to TIG's Morain, Local 450's attorney Douglas Selwyn ("Selwyn") stated that Local

---

[7] The trial transcript intermittently identifies January 15 or January 18, 2013 as the date of the "mediation."  Because date is immaterial, the Court uses the January 18 for consistency and clarity.

[8] At trial Lauve pointed out that technically the meeting was not a mediation because there was no mediator present, but only representatives for each side trying to talk about and resolve the issue. TT at p. 284.  The meeting appears to this Court to be the conference referred to in Article X, either Step 1 or 2, discussed *infra*.

[9] Referring to President James Callahan.

450's position was that the contract had never been "consummated" because no construction job had ever been identified by TIG in an email to Maher and because no Local 450 workers had been hired by TIG for projects worked in Local 450's jurisdiction.   Selwyn further contended that even if the agreement had been consummated, TIG had breached it by (1) failing to notify Local 450 by email of jobs in each project in the Houston area, (2) failing to staff any of those jobs with Local 450 members, and (3) failing to comply with the wages, rates, hours, and fringe benefits set out in Appendix A of the July 2012 Agreement, the subject of the October 2012 grievance filed by Swift.[10]   Local 450's General Referral Procedures, Def.'s Ex. 7; Selwyn's Letter, Pl.'s Ex. #5. Alternatively, the letter declared that the July 2012 CBA was terminated as of January 28, 2013.  Local 450 had not filed and did not file a grievance regarding the first two grounds stated in the letter.  Furthermore, as indicated, there was credible testimony that this letter was the first notice TIG received from 450 about

---

[10] The Referral Procedures of Local 450 were incorporated into the 2011 PLA and the July 2012 Agreement.  See Def.'s Ex. 1, July 2012 Agreement, Article VII, Sec. 1, which states,

> The Employer agrees that the hiring of all applicants shall be subject to and in accordance with the Union's established Referral procedure and any amendments thereto.  Should the Union fail to refer an applicant after two (2) working days, excluding Saturdays, Sundays, and Holidays, the Employer may hire an applicant from any source, provided that the applicant shall first acquire a referral from the Union prior to beginning work.

TIG's failure to email notice to Maher about 406 members going to Texas union jobs, as well as the other issues[11] with the exception of the pay dispute.  TT at pp.177-78, Morain's testimony.  After its purported termination of the July 2012 Agreement in January 2013, Local 450 returned to TIG all the dues money paid by TIG to Local 450 for the traveling Local 406 operators and around February 11, 2013 stopped clearing in 406 members referred by TIG.  TT at p. 87.

11.  Also after the alleged termination of the July 2012 CBA, Swift informed those Local 406 operators that he knew were in the area that there was not a valid CBA in place and therefore they could not work on jobs in Texas.  He asked them to leave and warned them that if they stayed, he would be forced to file charges against them for working without a CBA and without proper job clearance.  TT at pp. 87-88.

12.  On February 6, 2013 TIG's counsel sent Selwyn a letter denying all of the bases asserted by Local 450's attorney in the January 28, 2013 letter for the nonconsummation or termination of the CBA and stating that the July 2012 Agreement remained in effect until at least July 7, 2013 (its express expiration date) for the following reasons.  Pl.'s Ex. 39; TT at p. 139, 185.  First, for

---

[11] TIG's Morain did testify that on October 22, 2012 he asked 450's Maher to refer five cherry pickers (rough terrain cranes) for the Shell Deer Park facility and that Maher said he would get back to Morain, but he never did.  TT at pp. 183-84.

seven months Local 450 had accepted TIG's monthly payments of working dues and apprenticeship fund contributions for hours worked by Local 406 members, evidenced by copies of the cancelled checks, through 2012. Second, TIG did identify Local 406 members who were working in Texas on TIG's projects by informing Local 406, which then relayed the information via Benoit to Local 450, even though its practice was not in accord with that set out in the new July 2012 agreement. Third, while the Agreement did not specifically require TIG to hire any Local 450 members,[12] the bargaining unit was expressly limited to employees referred by Local 450 to TIG for employment on the Texas projects.  While TIG requested such referrals, Local 450 "has not been able to timely supply the requested referral with the required qualifications."  Fourth, Local 450 expressly promised in the July 2012 Agreement to "work with [TIG] to promote the utilization of IUOE members within the crane rental industry and to facilitate the employment of Local 406 members on the projects."  Morain testified at trial that Local 450 never complained about TIG's failure to hire Local 450 workers until Selwyn's January 28, 2013 letter.  TT 177-78.  In addition, TIG argued that the July 2012 Agreement did not require TIG to pay Local 406 members the same wages and benefit rates it paid Local 450 members.  Morain's testimony indicated that no grievance had

---

[12]  TIG's Morain testified that TIG never hired any Local 450 operators under the July 2012 CBA.  TT at p. 233.

been filed.  *Id.*  Furthermore, the ongoing Crane Rental Clear-In Procedure Agreement between Locals 450 and 406 confirmed TIG's right to send Local 406 members to Texas.  Finally, it was the practice for thirty years to allow freedom of movement for IUOE members in the Gulf Coast Region.

13.  Despite the letter, Maher continued to insist that the contract had been repudiated by Local 450.  TT 129-30.

14.  Morain also sent a letter to Maher on February 14, 2013 requesting Local 450 to fulfill its contractual obligations to clear Local 406 operators into Texas to prevent damages that would be caused by Local 450's continued repudiation, but Maher did not "change [his] course."  TT at 405.

15.  Meanwhile around February 11, 2013, Local 450 began to refuse to clear in members of Local 406 to work for TIG in the Houston area.  Local 450 also began, through its agents and representatives, to threaten Local 406 members and non-Local 406 members with charges, trials, and fines if they continued to work for TIG.  On or before February 18, 2013, Local 450 warned employees of TIG that were members of Local 406 that if they continued to work for TIG in the Houston area without Local 450 clearance, the IUOE would impose disciplinary fines of thousands of dollars on each of them and that those fines, unless paid, would be deducted from the retirement benefits due to them from the ERISA-regulated Central Pension Fund of the IUOE.

16.   Two weeks after the letter claiming repudiation of the July 2012 Agreement, Local 450's Swift called Benoit and Local 406 operators employed by TIG and told them they were no longer cleared to work in Texas and that Local 450 would file charges against them if they did.   TT at pp. 61, 87, 174, 185.   TIG subsequently told the operators that given the threats, it would not require them to go back to Texas.   TT at 185-86, 220-21, and Plaintiff's Ex. 27.

17.   Meanwhile TIG claimed that because of Local 450's refusal to clear in and threats of charges, trials and fines, many of TIG's employees left, and TIG was forced to quickly recruit, hire, train, and supervise a large number of replacement operators and oilers/support staff to safely and timely satisfy its contractual obligations to its Texas customers.   TT at 197-200.   TIG paid $109,989.58 in labor costs for replacement operators over what it claimed it would have paid the Local 406 operators, and an additional $400,644.78 for sending necessary teams of supervisors, engineers, and crane manufacturer representatives to the Texas sites to ensure that the new operators safely and competently operated the cranes.   Thus TIG seeks a total of $510,634.36 in damages that TIG claims it would not have incurred but for Local 450's repudiation of the July 2012 Agreement and threats to the Local 406 operators.   Pl.'s Exs. 19, 22, 23-26(b), 34, 37(a), 41-49, and TT 197-201, 208-20.   In addition, TIG claims it is now legally indebted to pay fines in the amount of $15,000, assessed

against three employees by Local 450, caused by the repudiation. TT 40, 43, 49-50, 52-53; Pl.'s Ex. 32.

**Conclusions of Law On Liability**

1. Section 301(a) of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 185(a), provides,

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The Court has federal question jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claim under Section 301(a). *See Houston Refining, LP v. United Steel, Paper and Forestry and Forestry, Rubber Mfg.*, 765 F.3d 396, 405-06 (5th Cir. 2014)("An allegation of a labor contract violation is both necessary and sufficient to support subject-matter jurisdiction under section 301(a)" of the LMRA, 29 U.S.C. § 185(a)), *citing Textron Lycoming Reciprocating Engine Division, Avco Corp. v. United Automobile, Aerospace, Agricultural Implement Workers of America, Intern. Union*, 523 U.S. 653, 657-58 (1998), and *Alexander v. International Union of Operating Engineers, AFL-CIO*, 624 F.2d 1235, 1238 (5th Cir. 1980). Section 301 of the LMRA makes collective bargaining agreements binding on unions and employers equally and makes such agreements enforceable in courts by either party. *Textile Workers Union of*

-14-

*America v. Lincoln Mills*, 553 U.S. 448, 453-54 (1957).  In addition to actions for damages, Section 301 also permits suits for specific enforcement and declaratory judgments.  *Tejidos de Coamo, Inc. v. Int'l Ladies Garment Workers' Union*, 22 F.3d 8, 15 (1962); *Black-Clawson Co. v. Int'l Ass'n of Machinists*, 312 F.2d 179, 181-82 (2d Cir.).

This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) over TIG's alternative Texas common-law claim for tortious interference with prospective business relations.

Venue is proper here under 29 U.S.C.§§ 1331 and 1391 (b) and (c).

2.  Federal substantive law governs the interpretation and enforcement of contracts under section 301(a) of the LMRA, 29 U.S.C. § 185(a).  *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992), *citing Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455 (1957).  When a court construes a labor contract, "'traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies.'"  *Id., quoting United Paperworkers Int'l Union, AFL-CIO, CLC v. Champion Int'l Corp.*, 908 F.2d 1252, 1256 (5th Cir. 1990).

3.  Whether a contract is ambiguous is a question of law for the Court.  *Mississippi Power Co. v. N.L.R.B.*, 284 F.3d 605, 619 n.39 (5th Cir. 2002); *Songcharoen v. Plastic & Hand Surgery*

*Associates, PLLC*, 561 Fed. Appx. 327, 332 (5th Cir. Apr. 2, 2014). So is the interpretation of unambiguous contracts. *Mississippi Power*, *id., citing Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000)("A contract is ambiguous only if its meaning is susceptible of multiple interpretations when subjected to applicable rules of contract construction and interpretations. The mere fact that lawyers may disagree on the meaning of a contractual provision is not enough to constitute ambiguity."). *See also Hometown 2006-1 1925 Valley View, LLC v. Prime Income Asset*, ____ Fed. Appx. ____ 2014 WL 6986027, at 309 (5th Cir. Dec. 11, 2014)("The interpretation of a contract--including whether the contract is ambiguous--is a question of law."). A contract is not ambiguous merely because the parties disagree on the correct interpretation or because it is reasonably open to only one interpretation. *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992). If the contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous and the Court may construe it as a matter of law. *Id.* When "the language of [a] contract is clear and unambiguous, courts may not inquire into the intent of the parties to contradict that plain meaning." *Paper, Allied-Industrial Chemical and Energy Workers Intern. Union, Local 4-12 v. Exxon Mobil Corp.*, 657 F.3d 272, 279 (5th Cir. 2011). "The court will not consider evidence of course of dealing or of a party's

subjective view about the meaning of a contract unless the contract is ambiguous." *Communications Workers of America, AFL-CIO v. Tyco Power Systems, Inc.*, No. Civ. A. 302CV1194D, 2003 WL 22271904, at *6 (N.D. Tex. Sept. 2, 2003)(*citing Alexander v. City of Evansville, Ind.*, 120 F.3d 723, 727 (7th Cir. 1997)(holding that "under well established principles of contract law, as applied to the interpretation of a collective bargaining agreement, the court should not resort to extrinsic evidence to interpret the agreement" and that court may only consult, *inter alia*, evidence about its formation or the parties course of conduct if there is some doubt about sense or meaning of contract.")), *aff'd*, 99 Fed. Appx. 499 (5th Cir. 2004).   Courts examining unambiguous contracts are restricted to the four corners of the document and cannot look to extrinsic evidence to create an ambiguity. *Abdelhak v. City of San Antonio*, 509 Fed. Appx. 213, at *2 (5th Cir. Jan 28, 2013), *citing Addicks Serv., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010). "'Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'"  *Id., quoting* 11 R. Lord, *Williston on Contracts* § 30:6, p. 108 (4th ed. 2012).

4.   The Court concludes that the July 2012 Agreement is clear and unambiguous.  Thus extrinsic evidence, including past practices of the parties, is not admissible for the purpose of construing it.

5.   Central to this suit, the July 2012 Agreement provided

Local 450 with a right to grieve and arbitrate any disputes under the terms and conditions of the CBA, with the arbitrator's determination being final and binding. *Id.* at Art. X, "Grievance and Arbitration Procedure." Article X provides,

> Section 1: Any dispute arising under the application or interpretation of the terms and conditions of this Agreement shall be resolved in accordance with the procedures set forth herein. No employee shall be discharged without just cause. No grievance shall be recognized unless called to the attention of the Employer by the Union, or to the Union by the Employer within five (5) days, excluding Saturdays, Sundays, and Holidays, after the alleged violation occurred or became known to the aggrieved party. Any employee, alleging a violation of this Agreement, shall file a grievance within five (5) working days, excluding Saturdays, Sundays, and Holidays, of the occurrence of the event which gave rise to the grievance or from the time the event became known to the affected employee or employees; otherwise the grievance shall be considered waived.

> Section 2: The time limits specified in this Article may be extended by mutual agreement between the parties.[13]

> Step 1: The dispute shall be referred to the Representative of the Union or his designated representative and the Project Superintendent and/or the Employer's Representative at the construction project within five (5) working days, excluding Saturdays, Sundays, and Holidays. A conference will be held during that time between the Union's Representative and the Employer's Superintendent or Representative to attempt to reach a resolution.

> Step 2: In the event the dispute is not resolved in Step 1 above, the grievance shall be reduced to writing and referred to the Union's Business Manager or Business Representative and the Employer's Project Manager or Human Resource Manager within seven (7) working days

---

[13] Because the parties agreed to meet over the pay dispute on January 13, 2013, they implied that they extended the deadlines for pursuing a grievance under Section 2 of Article X.

> after the date of the Step 1 conference, excluding Saturdays, Sundays, and Holidays, to attempt to reach a resolution.
>
> Step 3:  In the event the dispute is not resolved in Step 2 above, either party may refer the matter for final and binding Arbitration within seven (7) working days, excluding Saturdays, Sundays, and Holidays, after the date of the Step 2 conference.  An Impartial Arbitrator shall be selected from a panel of Arbitrators submitted by and in accordance with the rules and regulations of the Federal Mediation and Conciliation Service. Thereafter, the parties shall defer to the decision of the Arbitrator.  It is agreed that the Arbitrator shall have no authority to change, amend, add to, or detract from the provisions of this Agreement, but shall only rule on the applicability of the Agreement to the specific grievance submitted to him.  The expense of the Impartial Arbitrator shall be borne equally by the Union and the Employer.  The decision of the Arbitrator shall be final and binding on all parties. The CBA also provided Local 450 with a right to grieve and arbitrate any disputes under the terms and conditions of the CBA, with the arbitrator's determination being final and binding.  *Id.* at Art. X, "Grievance and Arbitration Procedure."

Dave Lauve testified without contradiction that the language of Article X came from Local 450's own standard contract language.  TT at pp. 273-74.

6.   The Court concludes that the July 2012 Agreement was "consummated" and binding.  Both parties executed it, with Maher signing it for Local 450 and sending it back to TIG confirming his approval.  Subsequent conduct by both sides demonstrates that it was in effect.  TIG made monthly payments of Local 450's working dues and contributions for hours worked to Local 450 for the months of July through November 2012 and Local 450 accepted them.  *See* Pl.'s Ex. 18, canceled checks; TT at p. 107.  In October 2012, in

accordance with the July 2012 Agreement's Article X, "Grievance and Arbitration Procedure," Swift filed a grievance over the pay of traveling Local 406 members based on Appendix A to the July 2012 CBA.  TT 103-96.  Swift testified that he did so because he was mistaken in thinking there was a contract in place until Maher told him in November 2012 that there was not.  Nevertheless Swift admitted that he continued clearing in TIG's Local 406 operators through January 2013, and he did not withdraw the grievance.  TT at pp. 105-07.[14]  The grievance went to conference[15] on January 18, 2013 in accordance with Step 1 or 2 of Article X.  Furthermore, although Maher contends that the agreement was never implemented because TIG never gave proper notice[16] to Local 450 of any Local 406 members for

---

[14] Maher testified that when a grievance was filed about an issue with a contractor, he did not necessarily know about it because he had business representative assistants who were assigned different areas with different contractors  and who took care of their areas, unless something got out of hand.  TT at p. 146.  In the case of Swift's grievance, Maher only found out about it when a number of workers subsequently called asking about their pay.  *Id.*

[15] As noted, there was no mediator but only representatives of the two sides discussing the dispute over pay.  This meeting appears to be the "conference" referred to in Step 1 or 2 of Article X, before the issue was to be reduced to writing and referred for formal mediation.

[16] Technically TIG was to call Local 450 regarding referrals for clearance, but instead, followed its previous practice of going through Local 406's Benoit, who forwarded the information to Local 450.  Local 450 did not file a grievance regarding TIG's method of providing notice after July 2012 and thus waived the issue.  Furthermore it cleared in every worker that TIG sent to jobs in Texas from July 2012 through January 2013.

clearance by Local 450, the evidence shows that TIG did give notice to Local 450 by email when it sent Local 450 the signed July 2012 Agreement and a one-page document stating, "We will be sending people to these three job sites:  OPD on Mont Bellevue, Dow in Freeport, and the Shell Deer Park job site."  TT at p. 125-26; Pl.'s Ex. 50.  Maher testified that when he received the email, TIG workers were already at work on those sites without pre-job conferences and that no 450 members were hired to work on those three jobs  TT at p. 145.  Maher stated, furthermore, that he did not receive any additional emails from TIG on any jobs after that, but that he did not think anything about it because TIG had such "a large presence."  *Id.*  He further stated that he just hoped that the CBA would give TIG the tool to bring in union workers from Louisiana, and it would then give Local 450 the tool to employ some of its members.  *Id.*  Thus, given the fact that TIG used Benoit to provide the information regarding 406 workers to be sent to Texas to Swift, as it had for years, and Local 450's failure to file a grievance on the issue, or on the failure to hold prejob conferences, and Local 450's ongoing conduct in fulfilling its obligations under the July 2012 CBA, the Court concludes that both issues were not only not material matters to Maher and Local 450, but were waived, and the 2012 CBA was not in breach.  TT at p. 126, 144, 287 (Lauve's testimony that other than the pay dispute, TIG did not receive any other grievances or written complaints from

-21-

Local 450).  On cross examination Morain testified at trial that some of these notices did not identify the project to which the 406 worker was being sent TT at p. 234), but that Local 450 also did not grieve such a deficiency.  Also as reflected in discrepancies between Benoit's clear-in sheet and phone records (Pl.'s exhibit 38 and exhibit 17), Benoit failed to notify 450 of a number 406 workers being sent in after Benoit received notice of them from Turner, a situation also not grieved.  TT at p. 235-42.  Nor did Local 450 file a grievance alleging that TIG failed to comply with local 450's Referral Procedure.  *Id.*  Again, Local 450's failure to file such grievances implies they were immaterial.  Furthermore because it did not do so, Local 450 waived these issues.[17]  *See* Article X, "Grievance and Arbitration Procedure."  Furthermore Swift testified that after receiving calls from Benoit, Swift cleared in every worker that TIG sent to Texas from July 2012 through January 2013.  TT at pp. 4, 107.  See also testimony of Morain, TT at pp. 175-77.

    7.  The preamble of the July 2012 Agreement states in relevant part,

---

[17] Local 450 argues that the grievance was a mistake because Maher considered the July 2012 Agreement to be unconsummated but did not inform his assistant Fred Swift, who filed the grievance. Regardless of whether the grievance was an error caused by lack of communication between officers of Local 450, it was filed in accordance with Article X, and Maher failed to file a grievance over his claims that TIG did not trigger the contract and thus waived the issue.

It is the intent and purpose of the Employer [TIG or Turner] and the Union [Local 450] to promote and improve the employment of 450 members by Turner, and to set forth in writing herein the basic terms of wages, hours, fringe benefits, and other terms and conditions of employment for all bargaining unit employees.

This agreement is binding on the Employer and the Union only on those projects identified to the Union by the Employe[r][18] by email to Local 450 Business Manager. By execution of this agreement, Turner Industries Group agrees to make such identification on each and every occasion Local 406 members are employed by Turner on projects within the jurisdiction of Local 450, regardless of the duration of such employment. Turner further agrees to remit to Local 450 working dues and apprenticeship contributions for all hours worked by Local 406 members on these projects.

Local 450 in turn will work with Turner to promote the utilization of IUOE members within the crane rental Industry, and to facilitate the employment of Local 406 members on the projects.

The July 2012 Agreement does not mandate that TIG hire any Local 450 members, nor provide any numbers or percentages for any such jobs; it only states that the parties' intent or goal was "to promote and improve the employment of 450 members by Turner" and that Local 450 in turn would "work to promote the utilization of IUOE members [which would include Local 406 members] within the crane rental Industry, and to facilitate the employment of Local 406 members on the projects."[19]

---

[18] There is no dispute that "Employee" was a typographical error and the word should have been "Employer." *See, e.g.,* TT at p. 175.

[19] The Union's Constitution (Def.'s Ex. #3 at pp. 48) sets out conditions, including having a pre-job conference, to entitle an employer to an exception to the union's clearance procedure

8.  "Federal labor policy favors the use of grievance and arbitration procedures, and contractual provisions should be liberally interpreted so as to require resort to such procedures wherever a contrary result is not clearly indicated."  *Boone v. Armstrong Cork Co.*, 384 F.2d 285, 288 (5th Cir. 1967)*, citing United Steelworkers of America, AFL-CIO v. Warriors & Gulf Navigation Co.*, 363 U.S. 574 (1960).  It is a well-established principle of labor law that a union and its members must exhaust the remedies provided in their collective bargaining agreement with the employer before they seek judicial intervention."  *National Post Office Mail Handlers Local No. 305, LIUNA, AFL-CIO v. U.S. Postal Serv.*, 594 F.2d 988, 991 (4th Cir. 1979), *citing Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53 (1965), and *United Steelworkers v. Am. Manufacturing Co.*, 363 U.S. 564, 566 (1960).  *In accord, Boone*, 384 F.2d at 288; *Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 86 (2002).  Where the union fails to exhaust the CBA's mandatory grievance procedure as the exclusive

---

for key employees which, if satisfied, permits and limits an employer to "bring in key employees as the third, sixth, ninth, and twelfth person hired."  However, the Constitution further states, "Nothing in the above three paragraphs shall limit a Local Union's ability in exercising its discretion to clear in members of other Local Unions, to mutually agree with an employer to a different key employee arrangement."  TT at p. 49.  Swift testified that he continued to clear in all TIG Local 406 operators through January 2013, and that Local 450 continued accepting dues payments on their behalf from TIG.  TT at p. 107. Swift also admitted that he knew that in the absence of a CBA, it is illegal for Local 450 to accept dues or fund contributions on behalf of an employee.  TT at pp. 11-12.

remedy for breach of the CBA, judgment in favor of the employer is appropriate. *Local Union 369, Intern. Brotherhood of Elec. Workers, AFL-CIO v. ADT Sec. Services, Inc.*, 393 Fed. Appx. 290 (6th Cir. Aug. 27, 2010).[20]

Moreover where one party objects that the other failed to comply with the notice provision in a contract or collective bargaining agreement, the objecting party must show actual prejudice or the first party's obligations are excused. *Smurfit Newsprint Corp. v. Southeast Paper Mfg.*, 368 F.3d 944, 952 (7th Cir. 2004)("If one party's obligations under contract are subject to condition precedent on [the] part of the party, first party's obligations are excused if [the] condition precedent is not met; however, if [the] party's obligations under the contract are subject to [the] duty of [the] other party, [the] first party's obligations are excused only where it can demonstrate prejudice to it in [the] failure of [the] second party to perform its duty."); *Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041, 1046 (1st Cir. 1990)(Shaw claimed the arbitration award was invalid because

---

[20] In *Local Union 369*, the Sixth Circuit, noting that the general rule is that dismissal based on a failure to exhaust administrative remedies is without prejudice, further held that even though "the distinction of with or without prejudice [was] of no practical import . . . since the time period within which a grievance could be filed expired long ago," nevertheless "the disposition should be stated correctly." It therefore granted summary judgment without prejudice. *Id.* at 294-95. *In accord, EEOC v. P.A.M. Transport, Inc.*, Civ. A. No. 09-CV-13851, 2011 WL 3919004, at *4 (E.D. Mich. Sept. 7, 2011).

he did not receive proper notice of the proceedings as specified in the CBA, but written notice was given to his attorney and he received actual oral notice, and thus received equivalent notice, the court found substantial compliance in the absence of any showing of substantial prejudice to Shaw); *Fly v. Newell-Rubbermaid, Inc.*, 50 Fed. Appx. 681, 689 (6th Cir. 2001)("As no one was prejudiced by the company's failure to deliver formal written notice in accordance with the contract's provisions, insistence upon compliance with a time line that the company and the Union apparently had agreed to waive would serve no purpose."). Local 450 has failed to show prejudice from TIG's using past practice to notify Local 450 of incoming 406 workers.

9. There is a presumption of arbitrability when a CBA contains an arbitration clause. *Houston Refining L.P. v. United Steel, Paper and Forestry, Robber*, 765 F.3d 396, 412 (5th Cir. 2014). Section 203(d) of the LMRA, 29 U.S.C. § 173(d) provides, "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of existing collective-bargaining agreement." It is also established law that in labor cases, the issue whether the parties have agreed to submit a dispute to arbitration is generally for the courts to decide under ordinary principles governing the formation of contracts. *Granite Rock Co. v. International Brotherhood of Teamsters*, 561

U.S. 287, 296, 297 (2010)("These issues typically concern the scope of the arbitration clause and its enforceability. In addition, the issues always include whether the clause was agreed to, and may include when that agreement was formed."); *Bilyeu v. Johanson Berenson, LLP*, 809 F. Supp. 2d 547, 550 (W.D. La. 20122). The court must decide whether the parties agreed to arbitrate the dispute even if it must interpret a provision of a bargaining agreement to do so. *Litton Financial Printing Div., a Div. of Litton Business Systems, Inc. v. NLRB*, 501 U.S. at 209; *Local Union No. 898 of the International Brotherhood of Electric, Inc.*, 380 F.3d 868, 870 (5th Cir. 2004).

10. The Court concludes that Article X makes mandatory the filing of a grievance regarding a dispute over the application or interpretation of the terms and conditions of this Agreement for it to be recognized ("Any dispute . . .***shall be*** resolved in accordance with the procedures set forth herein");("No grievance ***shall be*** recognized unless called to the attention of the Employer . . . "); (if a party does not grieve its complaint, that dispute "***shall be*** considered waived."). In contrast, it is not mandatory, but a matter of choice, whether after the grievance procedure, a party pursues a dispute in arbitration ("either party ***may*** refer the matter for arbitration").[21] After the January 18, 2013 "mediation"

---

[21] Whether or not the parties are bound to arbitrate a dispute under a collective bargaining agreement, as well as what

-27-

meeting in Houston, no further discussion of the pay issue took place, and Local 450 did not seek formal grievance nor arbitration of its pay issue.  TT at p. 122.  Thus the issue was waived under the express terms of Article X.

11.  Regarding the dispute over wages to be paid to Local 406 members working for TIG in Texas, Article XIII, "Wage Rates and Benefit Contributions Rates," in the July 2012 CBA provides,

> The classifications of employment, minimum wage rates and fringe benefit contributions required by this Agreement shall be in accordance with APPENDICES A and B, which are Incorporated into and made a part of this Agreement. Employees shall receive no less than the wages and benefits rates listed in APPENDICES A and B.

In addition to the signature page restriction that "this is a

---

issues they must arbitrate, is to be determined by the court based on the contract entered into by the parties.  *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241 (1962); *International Union of Operating Engineers v. Flair Builders, Inc.*, 460 U.S. 487, 491-92 (1972).  Thus that this Court may also determine if the collective bargaining agreement allows a damages action in district court instead of arbitration.  *Atkinson*, 370 U.S. at 241; *Johnston-Tombigbee Furniture Mfg. Co. v. United Brotherhood of Carpenters and Joiners*, 596 F.2d 126, 128-29 (5th Cir. 1979).  Although there is a presumption that the court decides substantive arbitrability, the parties can circumvent that presumption by clearly and unmistakably providing otherwise in their contract.  *AT&T Technologies, Inc.*, 475 U.S. at 649.  "[A] duty to arbitrate a particular grievance can stem only from a contractual agreement to arbitrate, and a determination of the scope of such a contractual term is peculiarly within the purview of the judiciary."  *Truck Drivers Local No. 807, I.B.T. v. Regional Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1042 (2d Cir. 1991).  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed to submit."  *AT&T Techs.*, 475 U.S. at 648, *quoting United Steel Workers of America*, 363 U.S. at 582.  Here, under the July 2012 CBA, arbitration was only at the election of a party.

participation agreement only and applies exclusively to employees referred by Local 450," the preamble of the July 2012 Agreement between TIG and Local 450 further provides,

> This agreement is binding on the Employer and the union only on those projects identified to the Union by the Emloye[r] by email to Local 450 Business Manager. By execution of this agreement, Turner Industries Group agrees to make such notification on each and every occasion Local 406 members were employed by Turner on projects within the jurisdiction of Local 460, regardless of the duration of such employment. Turner further agrees to remit to Local 460 working dues and apprenticeship contributions for all hours worked by Local 406 members on these projects.

As TIG has shown, Local 450 failed to refer its own workers to TIG's projects. On the other hand, TIG did not follow the express requirement that it notify Local 450's Business Manager Mark Maher by email of each time a Local 406 member was employed by TIG on a union project in Texas, but instead pursued a past practice of notifying Local 406's Benoit, who would then forward, at least most of the time, the information to Fred Swift. Nevertheless because neither party grieved this issue, it was waived.

The signature page of the July 2012 CBA (Plaintiff's Ex. 1) states,

> This Agreement may be opened for wages and benefit modifications only, by either party notifying the other, at least eighty (80) days prior to the annual anniversary date by registered or certified mail. . . . Notwithstanding the above, this is a participation agreement only and applies exclusively to employees referred by Local 450.

It is undisputed that neither party notified the other to reopen

-29-

the wage and benefit issue in the eighty-day period.  *See, e.g.,* testimony of Mark Maher, negotiator of the July 2012 CBA for Local 450, TT at pp. 121-22 (Neither party exercised its right to open negotiations on wages within 60 days before the CBA's anniversary date.).[22]

12.  The terms of the July 2012 Agreement also included a requirement that TIG participate in "pre-job conferences" when it obtained a project outside of its routine crane rental performance that created a need for a large number of employees for longer periods.  Plaintiff's Ex. No. 1, July 1, 2012 Agreement between TIG and Local 450, Art. VI.[23]  Local 450 failed to grieve the lack of

---

[22]Arbitrability questions "whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance."  *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986).  The court must resolve the issues of (1) was a contract formed and (2) does the contract provide for the arbitration of a dispute; all additional issues related to that dispute are matters for an arbitrator to decide.  *Id.* at 408 ("[T]he law presumes that courts have plenary power to decide the gateway question of a dispute's arbitrability--*i.e.*, whether [the parties] agreed to arbitrate the merits.").

[23] Article VI, section 1, states,

When the Employer obtains a project outside of normal day-to-day crane rental performance, such as a plant shut-down or outage, that will require substantial numbers of referrals for longer term operations at a specific project, the Employer agrees to notify the Union of such projects and shall arrange a date, time, and place to hold a pre-job conference prior to the commencement of any work.  The Union and the Employer shall discuss and agree upon such matters as starting time, number of hours of work per week, number of shifts, the anticipated number of employees required

pre-job conferences issue and therefore waived it.

13.  Even if Local 450's failure to grieve had not waived these issues, in *Transportation-Communication Emp. Union v. Union Pacific R. Co.*, 385 U.S. 157, 160-61 (1966), the United States Supreme Court opined,

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts. . . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law--the common law of a particular industry or of a particular plant. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements as well as the practice, usage and custom pertaining to all such agreements. This is particularly true when the agreement is resorted to for the purposes of settling a jurisdictional dispute over work assignments.

*Id*. (citations omitted).  *See also, e.g., Carmona v. Southwest Airlines Co.*, 536 F.3d 344, 348-49 (5th Cir. 2008)(quoting *id*.); *Sprague v. Central States, Southeast and Southwest Areas Pension Fund*, 269 F.3d 811, 816 (7th Cir. 2001)("The Kubalanza letter and the letter of agreement, laying out the abatement plan which the parties entered into before the 1997-2000 CBA was created, are key components of the overarching agreement between UPS and IBT, and must be included within the scope of 'governing documents.')(*citing

---

for the job, key employees, and any specific conditions that may require attention to enhance the safety and productivity of the job.

*Transportation Communication*).

Nevertheless, evidence of past practices and other bargaining agreements between the parties can only be admitted when the CBA is ambiguous, generally a question of law for the court. *See, e.g., Carpenters Amended and Restated Health Ben. Fund v. Holleman Const. Co.*, 751 F.2d 763, 766-67 (5th Cir. 1985); *Anheuser-Busch, Inc. v. Teamsters Local 477*, 280 F.3d 1133, 1139 (7th Cir. 2001)(reliance on past practices "is appropriate to interpret ambiguous contract terms," but they "cannot be relied upon to modify clear and unambiguous provisions")(*quoting Tootsie Roll Indus., Inc. v. Local Union #1*, 832 F.2d 81, 84 (7th Cir. 1987)), *cert. denied*, 537 U.S. 885 (2002); *Beacon Journal Pub. Co. v. Akron Newspaper Guild, Local Number 7*, 114 F.3d 596, 601 (6th Cir. 1997)("[P]ast practice or custom should not be used to interpret or give meaning to a provision or clause of the collective bargaining agreement that is clear and unambiguous."); *Kemmis v. McGoldrick*, 767 F.2d 594, 597 (9th Cir. 1985); *Senior v. NSTAR Elec. and Gas Corp.*, 449 F.3d 206, 219 (1st Cir. 2006)("An unambiguous contract must be construed according to its terms, under both the common law and labor law."). This Court has concluded that the July 2012 CBA was clear and unambiguous; therefore extrinsic evidence of the parties' past practices cannot be used to construe it.

14.   As an exception to the general rule under 29 U.S.C. §§ 159(a) and 158(a)(5), *i.e.*, that employers bargain only with unions

that have been selected for collective bargaining by a majority of the employees in a unit, Section 8(f) of the NLRA, 29 U.S.C. § 158(f), exempts employers within the construction industry who are permitted to sign a pre-hire agreement with a union regardless of how many employees authorized the union's representation. *United Broth. of Carpenters and Joiners of America. AFL-CIO v. Operative Plasterers' and Cement Masons' Intern. Ass'n of U.S. and Canada, AFL-CIO*, 721 F.3d 678, 691-92 (D.C. Cir. 2013)(reason for the exception is that "construction employees must know their labor costs up front in order to generate accurate bids and must 'have available a supply of skilled craftsmen ready for quick referral'"; furthermore established union organization does not suit the brief, project-to-project periods construction workers spend in the hire of any single contractor), *citing NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 348 (1978), and *Bldg & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 231 (1993). *See also Strand Theatre of Shreveport Corp. v. N.L.R.B.*, 493 F.3d 515, 518-19 (5th Cir. 2007).

The agreements between the parties (the PLAs and the broader, Master Crane Rental Evergreen Project Labor Agreement of July 2012 are all types of a section 8(f) pre-hire agreement. In *NLRB v. Black*, 709 F.2d 939, 941 n.1 (5th Cir. 1983)(citations omitted),the Fifth Circuit explained,

> Section 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), allows construction employers and unions to enter into agreements setting the terms and conditions of employment for those hired by the employer without the union's majority status having first been established pursuant to § 9 of the Act, 29 U.S.C. § 159.  The Act's authorization of the "pre-hire" agreements in the construction industry recognizes the "uniquely temporary, transitory and sometimes seasonal nature of much of the employment" in this industry might, in the absence of such agreements, unduly hinder both unions seeking to organize, and employers needing to know the cost and availability of workers in this industry.

As observed by the Fifth Circuit, a section 8(f) "pre-hire" agreement under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(f), is unique to the construction industry and an exception to the general rule that it is an unfair labor practice for an employer to enter into a collective-bargaining agreement with a union as the exclusive bargaining representative of all the employees in a proposed bargaining unit where the union does not have majority support:

> Section 9(a) of the NLRA requires employers to bargain with unions that have been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a); *see also Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 533 (D.C. Cir. 2003). However, the Act treats construction-industry employers differently with respect to the majority-support requirement. *Id.* Section 8(f) allows a contractor to sign "pre-hire" agreements with a union regardless of the union's majority status. 29 U.S.C. § 158(f); *Nova Plumbing*, 330 F.3d at 534; *In re Staunton Fuel & Material, Inc.*, 335 NLRB, 717, 718 (2001). The reason for this limited exception lies in the unique nature of the construction industry, which is organized differently because employees frequently work for multiple employers for short periods of time. *See Nova Plumbing*, 330 F.3d at 534; *American Automatic Sprinkler Sys., Inc. v. NLRB*,

163 F.3d 209, 214 (4th Cir. 1998); *NLRB v. Catalytic Indus. Maint. Co.*, 964 F.2d 513, 515 n.1 (5th Cir. 1992).

Sections 8(f) and 9(a) also differ in their treatment of the employer's bargaining obligations after a contract expires. *See Staunton Fuel*, 335 NLRB at 718; *see also Nova Plumbing*, 330 F.3d at 533. A construction-industry employer may refuse to bargain after the expiration of an 8(f) agreement because the union never enjoyed the presumption of majority support. *Id.* at 534; *Am. Automatic Sprinkler*, 163 F.3d at 215. In contrast, a non-construction employer must continue bargaining with a union after a 9(a) agreement expires because the union is entitled to a continuing presumption of majority status. *Nova Plumbing*, 330 F.3d at 534; *Am. Automatic Sprinkler*, 163 F.3d at 214; *Staunton Fuel*, 335 NLRB at 718 . . . . This presumption can be rebutted by the employer with evidence that the union has lost majority support. *See Staunton Fuel*, 335 NLRB at 718 . . . .

*Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518-19 (5th Cir. 2007).

In *John Deklewa & Sons, Inc.*, 282 NLRB 1375 (1987), the National Labor Relations Board overruled a number of its earlier decisions and held that § 8(f) pre-hire agreements cannot be repudiated during their terms by either the union or the employer.[24] Those Fifth Circuit cases that held the opposite, cited by Local

---

[24] Before *Deklewa*, a party could extinguish its obligations under a § 8(f) collective bargaining agreement by unilaterally repudiating the agreement. At that time a prehire agreement could be effectively repudiated upon the employer's mailing of a certified letter to the union which specifically terminated all agreements between parties. *William R. Nash, Inc. v. Local Union No. 719, Broward County, Fla., of Plumbing and Pipefitting Industry of the U.S. and Canada*, 653 F. Supp. 1016, 1023-24 (S.D. Fla. 1985), *citing Contractors, Laborers, Teamsters & Engineers Healt & Welfare Plan v. Harkins Construction & Equipment Co.*, 733 F.2d 1321, 1326 (8th Cir. 1984); *Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan v.* D.A. Construction Co., 725 F.2d 460, 461 (8th Cir. 1984).

450, were issued prior to *Deklewa*.   Since *Deklewa* was issued, although most Circuit Courts of Appeals have followed it, "the Fifth Circuit has not conclusively adopted or rejected *Deklewa's* holding." *N.L.R.B. v. Catalytic Indus. Maintenance Co. (CIMCO)*, 964 F.2d 513, 521 n.11 (5th Cir. 1992). *See also Strand Theater of Shreveport Corp. v. NLRB*, 493 F.3d 515, 519 n. 1 (5th Cir. 2007)("Although other circuits[25] have adopted [*John Deklewa & Sons, Inc.*, 282 NLRB 1375 (1987)(holding that such agreements cannot be repudiated during their terms)], the Fifth Circuit has not yet resolved this issue and we need not do so today."), *review denied, enforcement granted sub nom. Int'l Ass'n of Bridge Structural & Ornamental Iron Workers, Local 3. v. NLRB,* 843 F. 2d 770 (3d Cir. 1988), *cert. denied sub nom. DEKLEWA v. NLRB*, 488 U.S. 889 (1988)].

---

[25] Eight out of ten Circuits have followed *Deklewa*. *See*, e.g., *Mesa Verde Const. Co. v. N. Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1134 (9th Cir. 1988)(*en banc*), and *N.L.R.B. v. Viola Industries-Elevator Div., Inc.*, 979 F.2d 1384 (10th Cir. 1992).  The First, Third, Seventh, Eighth, Eleventh and District of Columbia Circuit Courts of Appeals have also adopted the *Deklewa* holding that an 8(f) agreement is binding and enforceable during the duration of the contract and cannot be unilaterally repudiated by either party to the agreement. *C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 357 (1st Cir. 1990); *Internat'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB*, 843 F.2d 770 (3d Cir. 1988); *NLRB v. Bufco Corp.*, 899 F.2d 608, 609, 611 (7th Cir. 1990); *NLRB v. W.L. Miller Co.*, 871 F.2d 745, 748 (8th Cir. 1989); *NLRB v. Triple A Fire  Protection, Inc.*, 136 F.3d 727, 731 n.4, 735 (11th Cir. 1998), *cert. denied*, 525 U.S. 1067 (1999); *United Broth. of Carpenters and Joiners of America, AFL-CIO v. Operative Plasterers' & Cement Masons' Intern. Ass'n of U.S. & Canada, AFL-CIO*, 721 F.3d 678, 694 & n.7 (D.C. Cir. 2013).

In *United Brotherhood of Carpenters and Joiners Local Union 953 v. Mar-Len of*, 906 F.2d 200, 203 (5th Cir. 1990), while stating that the panel did not have to decide "whether the NLRB's present interpretation of § 8(f), announced in *Deklewa*, is the controlling law in this circuit," the panel "assumed for the purpose of this opinion" that it was, addressed the issue whether it was retroactive for purposes of that case and held that it was not.[26] This Court predicts that the Fifth Circuit will join with all of its sister circuits in following the *Deklewa* rule when it addresses the question.  Applying the *Deklewa* rule here, this Court concludes that Local 450 could not legally unilaterally repudiate the July 2012 CBA.[27]

---

[26] Only the Fourth and the Fifth Circuits have not yet adopted *Deklewa*, and the Fourth Circuit opined it was "precluded from adopting *Deklewa* as the law of the Circuit because it stands in conflict with *Clark v. Ryan*, 818 F.2d 1101 (4th Cir. 1987)" and would have to have an *en banc* opinion doing so before overruling *Clark*.  *American Automatic Sprinkler Systems, Inc. v. N.L.R.B.*, 163 F.3d 209, 215 (4th Cir. 1998).  All the other Circuit Courts of Appeals have adopted *Deklewa*.

[27] Furthermore, as the Third Circuit opined in *International Union of Operating Engineers, Local Union No. 542 v. Allied Erecting & Dismantling Co.*, 556 Fed. Appx. 109, 116 n.9 (3d Cir. 2014)(*citing Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 G.2f 770, 773 (3d Cir. 1988) (resolving in the affirmative "whether during its term a § 8(f) agreement is as binding and enforceable *as any other union agreement*" and noting that the NLRB's rationale that a "right of unilateral repudiation is . . . antithetical to *traditional principles of collective bargaining* under the [NLRA]"[emphasis added])), the *Deklewa* rule applies beyond § 8(f) agreements, including to 9(f) agreements.  *See also Builders, Woodworkers & Millrights, Local Union No. 1 (Glen Falls Contractors Ass'n)*, 341 NLRB 448, 448 n.2 (2004)("Regardless of whether this may have

-37-

Even if the Fifth Circuit holds otherwise and *Deklewa* did not apply, as explained in 13 Richard A. Lord, *Williston on Contracts* § 39:37, at 663-68 (4th ed. 2000)(footnotes omitted),

> When one party to a contract expressly or by implication repudiates it, before the time for that party's performance . . ., the other party is relieved from performance.  In other words, an anticipatory repudiation of the contractual duties by one party to the contract excuses performance by the other.  A breach of contract caused by a party's anticipatory repudiation, such as an unequivocal indication that it will not perform when performance is due, allows the other party to treat the repudiation as an immediate breach of contract and sue for damages. . . . For a repudiation of a contract by one party to be sufficient to give the other party th right to recover for breach, the repudiating party must have communicated, by word or conduct, unequivocally, unconditionally, and positively, its intention not to perform . . . .
>
> Accordingly, when one party to a contract repudiates it or notifies the other party before a default that it will not perform, the nonrepudiating party may enforce the contract without first performing or offering to perform those provisions of the contract requiring performance in favor of the repudiating party.  The repudiating party, on the other hand, cannot demand performance from the nonrepudiating party and may not sue the nonrepudiating party for nonperformance. . . .
>
> When one party to a contract repudiates it, the other party is entitled to restitution for any benefit that has been conferred on the repudiating party as a result of part performance or reliance.

---

been a 9(a) or 8(f) relationship, the . . . employers were not free to unilaterally repudiate their agreement with the Carpenters and recognize the Respondent."); *Deklewa*, 282 NLRB at 1386 ("Our new analytic framework also better fulfills general statutory policies and integrates Section 8(f) with other sections in the Act.  In this regard, the policy of labor relations stability in the Act generally favors requiring parties to adhere to a voluntarily adopted collective-bargaining agreement.").

*See also Mulvaney Mechanical, Inc. v. Sheet Metal Workers Intern. Ass'n, Local 38*, 351 F.3d 43, 46 (2d Cir. 2003)("Upon repudiation, a contract does not cease to exist, but merely becomes voidable, and the non-repudiating party may enforce the contract or rescind it."), *citing* 4 Arthur Linton Corbin, *Corbin on Contracts* § 982, at 944-45 (1951); *Ramirez-Lebron v. International Shipping Agency, Inc.*, 595 F.3d 124, 12 & n.4 (1st Cir. 2010)(Since "[m]utual promises to grieve and arbitrate are agreed equivalents of each other[,] [a] repudiation by one party of his promise to grieve and arbitrate discharges the duty of the other party to perform his reciprocal promise.")(*citing Vaca v. Sipes*, 386 U.S. 171, 185 (1967)(employer's repudiation of labor contract relieved employee of the duty to pursue grievance procedure) and 10 John E. Murray, Jr. & Timothy Murray, *Corbin on Contracts*, § 972, at 102 (Cum. Supp. 2009)(interim edition).  *See also United Slate, Tile and Composition Roofers, Damp and Waterproof* 731 F.2d 495, 500-01 (7th Cir. 1984)("federal policy requiring exhaustion of contractual remedies does not apply when the company, by its actions, repudiates the contract and its grievance machinery.").  Thus Local 450's repudiation of the CBA relieved TIG of the requirement to grieve its claim of breach of contract and permitted TIG to sue to enforce the contract and recover damages in this lawsuit.

15.  The Court concludes Local 450 materially breached the July 2012 CBA when it had not only repudiated the CBA by word in

Selwyn's January 28, 2013 letter, but by conduct as of February 2013 in completely stopping meeting any and all of its obligations under the CBA, returning TIG's payment of dues and apprenticeship funds for its 406 workers in Texas, and threatening Local 406 members remaining in Texas on union jobs with charges, trials, fines and retirement benefit reductions. Thus TIG properly sues to enforce the contract and recover damages.

16.   Because TIG prevails on its breach of contract claim, the Court does not reach TIG's alternative claim of tortious interference with prospective business relations under Texas law.

**Damages**

**Conclusions of Law**

"The appropriate measure of damages" for the breach of a CBA is "the 'actual loss sustained by the plaintiff as a direct result of the breach and which may reasonably be supposed to have been in the contemplation of the parties as the probable result of such a breach at the time the agreement was made.'" *Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 552 (7th Cir. 2000)(*en banc*), *cert. denied*, 531 U.S. 1078 (2001). "In a breach of contract action under § 301 of the LMRA, damages should place the aggrieved party in the position it would have been in had the breach . . . not occurred." *Id.* at 553.   The injured party must prove that the damages are foreseeable, certain, and not avoidable. *Id.* at 553.   Foreseability is determined as of the time

-40-

the parties entered into the CBA, and the question is whether a reasonably prudent person in the shoes of the breach party, at the time the parties entered into the contract, would have considered these damages to be the natural consequence of the breach.  *Id.* at 553-54.  Citing 5 Arthur Linton Corbin, *Corbin on Contracts* § 992 at 6 (1st ed. 1994), the Seventh Circuit has opined that the prevailing party in a labor context may recover for breach of contract "[t]he amount of compensatory damages . . . (1) the net amount of losses caused by the breach, *plus* (2) the gains prevented because of the breach minus (3) the savings made due to the breach.  Thus, damages = losses caused + gains prevented - savings made."  *Id.* at 553 & n.14.  *See also Williston On Contracts*, § 55:63 ("Federal judicial remedies for breach of labor agreements--Monetary relief")(database updated May 2014)("An employer may recover monetary damages for losses sustained as the result of a defendant's breach of the collective bargaining agreement"); *Eazor Exp., Inc. v. International Brotherhood of Teamsters, Chauffeurs*. 376 F. Supp. 841, 845 (D.C. Pa. 1974)("[B]ecause a collective bargaining agreement is a contract and enforceable as such, the traditional criteria for the ascertainment of damages where a contract has been breached-- foreseeability and proximate cause--are applicable.")(*citing Williston on Contracts* §§ 1020A and 1362 (3d ed. 1968), *modified on other grounds*, 520 F.2d 951 (3d Cir. 1975), *cert denied*, 424 U.S.

935 (1976).  As a general rule, "all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain."  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).  The plaintiff bears the burden of proving what actual losses were suffered as a result of the breach.  *Plastics Div., Tenneco Chemicals, Inc. v. Teamsters, Local 401*, 520 F.2d 945, 949 (3d Cir. 1975).

Once the fact of damages has been established, uncertainty as to their amount will not foreclose recovery where they can be proved with reasonable certainty.  *Blue Diamond Coal Co. v. United Mine Workers of America*, 436 F.2d 551, 561 (6th Cir. 1970), *citing inter alia Story Parchment Ci. v. Peterson Parchment Co.*, 282 U.S. 555, 562-63 (1931)("[W]hile damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of damages as a matter of just and reasonable inference, although the result may be only approximate.  The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.").  Questions raised about damages are questions of fact.  *Blue Diamond*, 436 F.2d at 561.

Federal law governs prejudgment interest when a cause of action arises for a federal statute, as here.  *Matter of Texas*

*General Petroleum*, 52 F.3d 1330, 1339 (5th Cir. 1995).  The LMRA is silent about prejudgment interest, so the general federal rule, that in the absence of a statutory provision, an award of prejudgment interest is within the discretion of the district court, applies here.  *See Oil, Chemical and Atomic Workers Intern. Union, Local 4-447 v. American Cyanamid Co.*, 546 F.2d 1144, 1133 (5th Cir. 1977); *Equal Employment Opportunity Commission v. Wooster Brush Co. Employees Relief Assoc.*, 727 F.2d 566, 579 (6th Cir. 1984); *Beelman Truck Co. v. Chauffeurs, Teamsters, Warehousemen and Helpers*, 33 F.3d 886, 892 (7th Cir. 1994).  The applicable rate of prejudgment interest is within the court's discretion.  *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071-72 (2d Cir. 1995); *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003); *Wolf v. Frank*, 477 F.2d 467, 497 (5th Cir. 1993).

"[P]rejudgment interest is awarded to fully compensate a plaintiff for an actual monetary loss sustained as a result of a defendant's breach of an obligation."  *See Calderon v. Presidio Valley Farmers Ass'n*, 863 F.2d 384, 392 (5th Cir. 1989).  *See also P.A. Bergner & Co. v. Bank One*, 140 F.3d 1111, 1123 (7th Cir. 1998)("[P]rejudgment interest should not be thought of as windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money."); *R.L. Coolsaet Const. Co. v. Local 150, Intern. Union of Operating*, 177 F.3d 648, 661 (7th Cir. 1999)("Prejudgment interest is based on the notion

that a plaintiff is not fully compensated unless it received interest for the time it was deprived [of] the use of its money.).

Because there is no applicable federal statute establishing a prejudgment interest rate and § 301 of the LMRA is silent about it, the granting of prejudgment interest falls under the equitable powers of the district court, and the court may look to state law setting prejudgment interest in setting the rate. *Colon Velez v. Puerto Rico Marine Mgmt., Inc.*, 957 F.2d 933, 941 (1st Cir. 1992); *Lodges 743 & 746, International Ass'n of Machinists v. United Aircraft Corp.*, 543 F.2d 422, 446 (2d Cir. 1975); *Quaker Oats Co. v. International Chemical Workers Union*, 986 F.2d 1422, at *2 (6th Cir. 1992)(Table). Under Texas law, Tex. Fin. Code § 304.003(c), prejudgment interest is usually calculated at the prime rate published by the Board of Governors of the Federal Reserve System, and if the rate is less that five percent, the prejudgment interest is calculated at five percent per annum.

Under the general "American rule," a successful plaintiff is generally not entitled to recover attorney's fees from the losing party unless (1) the losing party pursued the litigation in bad faith, vexatiously, wantonly, or for oppressive reasons (2) the fee would spread the cost of the lawsuit among members of a class who benefitted from the litigation, or (3) the fees are properly an element of damages or are authorized by statute." *Rogers v. Air Line Pilots Ass'n, Intern.*, 988 F.2d 607, 615 & n.9 (5th Cir. 1993),

*citing Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975), and *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129 (1974); *Meredith v. Louisiana Federation of Teachers*, 209 F.3d 398, 405-06 (2000); *United Steel, Paper and Forestry, Rubber Mfg., Energy, Allied Indus. and Service Workers Intern. Union v. Noranda Alumina, LLC*, 2015 WL 858589 (E.D. La. Feb. 27, 2015).   The Fifth Circuit requires that the "bad faith" acts must have occurred in the course of the litigation, not in the manner in the acts that caused the law suit.   *Id.* at 616.

**Findings of Fact**

Regarding TIG's claim for damages[28] it would not have incurred but for the alleged repudiation eight days before a major outage at the Shell Deer Park site and subsequent threats to its 406 operators working in Texas, TIG submitted (1) Pl.'s Ex. 19, receipts for meals and expenses for the replacement supervisors and safety teams, incurred and paid by TIG because of the loss of its 406 operators; (2) Pl.'s Ex. 20, payments made to out-of-state technicians TIG brought in; (3) Pl.'s Ex. 20A, hotel travel expenses summarizing Ex. 20, including fuel for transportation back and forth; (4) Pl.'s Ex. 22, charges for processing, signing up,

---

[28] TIG requests $109,989.58 in labor costs for approximately 70 replacement crane operators and another $400,644.78 for supervisors, engineers, and representatives of crane manufacturers to insure the cranes were safely operated.

and screening new employees, supervisors, and technicians for TIG's Shell Deer Park project; (5) Pl.'s Ex. 23, job site expenses for safety orientations; (5) Pl.'s Ex. 23A, a summary of the all the previously mentioned charges; (6) Pl.'s Ex. 24, charges for hotel rooms for the new Shell Deer Park employees; (7) Pl.'s Ex. 25, pay these workers received for work in Texas at the time of the breach; (8) Pl.'s Ex. 26, invoices from United Labor Group for recruiting and referring operators; (9) Pl.'s Ex. 26A, summary of the invoices in Pl.'s Ex. 26; (10) Pl.'s Ex. 26B, summary of United Labor Group, extra costs to TIG for United Labor Group's charges as compared with what TIG would have paid 406 workers, totaling $109,989; (11) Pl.'s Ex. 34, charges for meals for employees sent in by TIG for June-September 2013; (12) Pl.'s Ex. 34A, summary of Exhibits 19 and 34 from Feb. 15-April 30, 2013 and from April 30-November 22, 2013; (13) Pl.'s Ex. 35, fuel charges for employees to come to Texas; (14) Pl's Ex. 35A, hotel expenses; (15) Pl.'s Ex. 37, supervisors' pay for work in Texas; (16) Pl.'s Ex. 37A, summary of Exhibits 25 and 37.  See Morain's testimony on direct examination, TT at pp. 207-220, 223-28.

At trial, Local 450's attorney raised significant questions about the validity of TIG's requested damages.  While TIG claimed it had only eight days to re-staff its Texas projects with workers, on cross examination of Morain, counsel highlighted the fact that although TIG received notice of Local 450's repudiation within days

of Selwyn's January 28, 2013 letter, the first date TIG employed someone from ULG was February 24, 3013, far more than eight days. TT at pp. 349-50.  Furthermore, while Morain conceded that TIG paid its own 406 workers approximately $30 per hour, it paid its purported far less trained, less skilled, and less experienced ULG workers $51.57 per hour under a pre-existing contract which Morain claimed he did not have time to renegotiate.  TT at pp. 248-49. When asked why he did not try to find cheaper operators, Morain insisted, "We were calling everybody we could to find operators." TT at p. 250.  His statement was then impeached by his own deposition testimony:  when he was asked, "[C]an you tell me about where all you sought crane operators that might work at lower rates," he responded, "No, I can't."  TT at pp. 250-51.[29]  Morain conceded that many of the invoices in Pl.'s exhibit 20 for "outside service expenses" were for repair and maintenance of TIG's cranes; when questioned, Morain stated without clarifying, "No, I'm not asking for Local 450 to pay for maintenance.  If it was repair by damage, then I could possibly be asking for that."  TT at p. 251.  When questioned about the approximately $230,000 TIG was requesting in salary for 15 supervisors and salesmen, Morain admitted that some of them were salesmen in Louisiana who were sent

---

[29] On redirect TIG's counsel tried unpersuasively to rehabilitate him, pointing out that during his deposition, Morain stated without any further detail that he did look "at our personnel office."  TT at p.262.

to Texas as supervisors, that there was no documentation that showed what they were doing for the thousands of hours being charged to Local 450, and that these "salesmen/supervisors" would have been paid either way, in Louisiana or Texas.  TT at pp. 251-52.  Regarding expenses for their replacement workers' meals, Morain admitted to multiples of seven receipts, one in particular from Grady Covington's Holiday Inn in Plaintiff's Exhibit 34 at pp. 14, 16, 18, and 20 that appeared up to four times for the same meals.  TT at pp. 153-5.[30]  Moreover that receipt included $37.00 for liquor.  TT a p. 255.  Another receipt, p. 78 of Ex. 34, was for $433 for dinner at Perry's Steakhouse, while other receipts were for four trips to Hooters.  *Id.*  Plaintiff's Ex. 19 at p. 10 reflects another steak dinner for $303 dollars at Saltgrass Steak House.  Page 103 of Exhibit 19 reflects a charge of over $100 for liquor over a three-day period, while page 107 shows a charge of $609 for a dinner at Cullen's.[31]  TT at 256.  Morain conceded that he had no documentation showing that these workers would be having expensive dinners and drinking liquor at TIG's expense if they were not in Texas.

Even though any extension of the CBA beyond its expiration

---

[30] On redirect, Morain admitted it was an "error" and the duplicates should have been deleted by him.  TT at p. 263.

[31] On redirect Morain stated that "even though it does appear to be a very expensive meal," it was for about ten people.  TT at p. 263.  He does not address why these workers were eating so many steak dinners and charging TIG for liquor.

date required agreement of both parties, which was not effected, TIG also seeks damages up through nearly the close of 2013 well past the date that the contract expired by its own terms, i.e., June 30, 2013.   TT at p. 257.   Morain conceded the amount of damages requested for the period after June 30, 2013 might be tens of thousands of dollars.   TT at p. 258.

The Court finds that TIG clearly sustained an actual loss as a direct result and natural consequence of Local 450's repudiation and breach of the CBA and that the need to replace workers and pay for their upkeep for its Texas job sites in a reasonable time was foreseeable when they entered into the CBA, if the CBA were terminated before its expiration.   Nevertheless, the Court finds that the flaws in the amounts of TIG's request highlighted at trial make its calculations questionable and its losses uncertain.   The Court is unable to determine which invoices or parts of invoices are multiples and are reliable and reasonable and which are not. Nor can it determine what pay rates for workers assigned to jobs they have never done or were less competent than 406 workers should be or whether they could have been mitigated.   The uncertainty, however, should not completely foreclose recovery by TIG. Accordingly, after considering the matter, the Court finds that TIG's request for  $510,634.36 should be reduced by thirty percent (30%), or by $153,190.30.   Thus the Court finds that TIG is entitled to recover $357,444.06 in damages.

-49-

Moreover, the Court finds that an award of prejudgment interest is appropriate to compensate TIG for the lost interest on income of the monies it lost. Because the current prime rate published by the Board of Governors of the Federal Reserve System is less than five percent, under Tex. Fin. Code § 304.003(c) the Court grants prejudgment interest at the rate of 5% from February 11, 2013, when Defendant stopped clearing in Plaintiff's Local 406 members, to entry of final judgment.

The Court finds that the American Rule should apply to preclude an award of attorney's fees to TIG as TIG has failed to show that any of the exceptions to the rule are applicable here.

**SIGNED** at Houston, Texas, this __16th__ day of __April__, 2015.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE